2014-5078

# United States Court of Appeals
# for the Federal Circuit

G4S TECHNOLOGY LLC,

*Plaintiff-Appellant,*

*v.*

UNITED STATES,

*Defendant-Appellee.*

*Appeal from the United States Court of Federal Claims in
Case No. 1:12-cv-00008-NBF Judge Nancy B. Firestone*

## APPELLANT'S PRINCIPAL BRIEF

LEWIS S. WIENER, ESQ.
SUTHERLAND ASBILL
& BRENNAN LLP
700 Sixth Street, N.W., Suite 700
Washington, D.C. 20001-3980
202.383.0140
202.637.3593 (fax)
lewis.wiener@sutherland.com

*Counsel for Plaintiff-Appellant
G4S Technology LLC*

G. BRENDAN BALLARD, ESQ.
SUTHERLAND ASBILL &
BRENNAN LLP
700 Sixth Street, N.W., Suite 700
Washington, DC 20001-3980
202.383.0820
202.637.3593 (fax)
brendan.ballard@sutherland.com

*Of Counsel for Plaintiff-Appellant
G4S Technology LLC*

JULY 14, 2014

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Plaintiff-Appellant, G4S Technology LLC, certifies the following:

1.    The full name of every party represented by me is:

 G4S Technology LLC

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

<u>The party named in the caption is the real party in interest represented by me.</u>

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

<u>G4S Technology LLC is 100% owned by G4S Technology Holdings Inc. and G4S Technology Holdings Inc. is 100% owned by G4S Holding One Inc.  G4S Holding One Inc. is 100% owned by G4S Corporate Services Limited, a UK company. G4S Corporate Services Limited is 100% owned by G4S PLC, a UK company publicly traded in the London Stock Exchange.</u>

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court are:

<u>Sutherland Asbill & Brennan LLP:  Lewis S. Wiener, G. Brendan Ballard</u>

<u>McGrath North Mullin & Kratz, PC LLO:  Robert J. Bothe, Robert P. Diederich</u>

Dated: July 14, 2014          /s/ Lewis S. Wiener
                              Lewis S. Wiener, Esq.

i

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ......................................................................i

TABLE OF AUTHORITIES ........................................................................iv

STATEMENT OF RELATED CASES .........................................................1

JURISDICTIONAL STATEMENT ..............................................................1

STATEMENT OF THE ISSUES...................................................................1

STATEMENT OF THE CASE......................................................................2

STATEMENT OF THE FACTS ....................................................................5

    A. The Principal Purpose of the Loan Was to Pay Vendors to
       Construct a Rural Broadband Network. ...................................................5

    B. RUS Was Intimately Involved in the Selection, Hiring,
       Management, and Payment of Vendors, Including G4S. ..........................7

         1. RUS Approved Build-Out Plans Every Six Months.......................8

         2. RUS Dictated the Specifics and Details of the
           Procurement Process. ......................................................................8

         3. RUS Reviewed, Revised, and Approved the
           Master Services Agreement and Contracts Between
           Open Range and G4S. .....................................................................9

         4. RUS Made Sure That RUS Funds Were Used Only
           to Pay for Approved Vendor Work and Was Involved
           on a Day-to-Day Basis in the Vendor Payment Process................11

         5. There Was Constant Communication Between and
           Among Open Range, RUS, and Vendors.......................................13

         6. A Variety of Unique Circumstances Resulted in Arrearages
           Owed to Vendors, Including G4S. .................................................15

7. Open Range, RUS, and OEP Entered into the Loan
Amendment, Equity Commitment Letter, and RUS/OEP
Agreement to  Memorialize RUS's Obligation to Fund
Arrearages Owed to Vendors and Payments
Going Forward. ..............................................................................19

8. RUS's Failure to Follow Its Own Procedures Resulted in
Continued Arrearages Owed to Vendors, Including G4S..............23

SUMMARY OF ARGUMENT ...............................................................26

ARGUMENT .........................................................................................27

I.    Relevant Legal Standards ....................................................27

II.   The Trial Court Erred in Holding That There Was No
Genuine Issue of Material Fact With Respect to Whether G4S
Was a Third Party Beneficiary of the Loan Agreement
Between RUS and Open Range. ............................................29

III.  The Trial Court Erred in Its Application of the Federal
Circuit's Third Party Beneficiary Precedent..........................36

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................50

ADDENDUM

February 11, 2014 Opinion (Doc. No. 71) ...................................A1

February 11, 2014 Judgment (Doc. No. 72)...............................A27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) .......................................................................28

*Burnside-Ott Aviation Training Center, Inc. v. United States,*
   985 F.2d 1574 (Fed. Cir. 1993) .....................................................29

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .......................................................................29

*Christos v. United States,*
   300 F.3d 1381 (Fed. Cir. 2002) .....................................................37

*Cienega Gardens v. United States,*
   194 F.3d 1231(Fed. Cir. 1998) ......................................................49

*Cooper v. Ford Motor Co.,*
   748 F.2d 677 (Fed. Cir. 1984) .......................................................28

*D & H Distrib. Co. v. United States,*
   102 F.3d 542 (Fed. Cir. 1996) ................................................. 38, 39

*Digeo, Inc. v. Audible, Inc.,*
   505 F.3d 1362 (Fed. Cir. 2007) .....................................................29

*Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corp.,*
   840 F.2d 917 (Fed. Cir. 1988) .......................................................29

*Flexfab, L.L.C. v. United States,*
   424 F.3d 1254 (Fed. Cir. 2005) ................................................ 37, 44

*JGB Enterprises, Inc. v. United States,*
   63 Fed. Cl. 319 (2004), *aff'd,*
   497 F.3d 1259 (Fed. Cir. 2007) ............................. 1, 39, 40, 41, 42, 43, 44, 45, 50

*Lakeshore Engineering Services, Inc. v. United States,*
      748 F.3d 1341 (Fed. Cir. 2014) ............................................................28

*Long Island Savs. Bank, FSB v. United States,*
      503 F.3d 1234 (Fed. Cir. 2007) ..........................................................27

*M. Maropakis Carpentry, Inc. v. United States,*
      609 F.3d 1323 (Fed. Cir. 2010) ..........................................................27

*Montana v. United States,*
      124 F.3d 1269 (Fed. Cir. 1997) ..........................................................37

*O. Ahlborg & Sons, Inc. v. United States,*
      74 Fed. Cl. 178 (2006).............................................. 46, 47, 48, 49, 50

*Schooner Harbor Ventures, Inc. v. United States,*
      569 F.3d 1359 (Fed. Cir. 2009) ..........................................................28

*Sullivan v. United States,*
      625 F.3d 1378 (Fed. Cir. 2010) ................................................. 37, 42

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
      247 F.3d 1316 (Fed. Cir. 2001) ..........................................................28

*United States v. Johnson Controls, Inc.,*
      713 F.2d 1541 (Fed. Cir. 1983), ..........................................................48

**Statutes**

28 U.S.C. § 1295(a)(3) ............................................................................1

28 U.S.C. § 1491 ....................................................................................1

**Rules**

Federal Circuit Rule 47.5 .......................................................................1

RCFC 12(b)(1) .......................................................................................2

RCFC 12(b)(6) ........................................................................................................2

RCFC 30(b)(6) ........................................................................................................5

RCFC 56(a) ...........................................................................................................28

**Other Authorities**

Merriam-Webster.com. Retrieved July 9, 2014, from http://www.merriam-
    webster.com/dictionary/oversee ........................................................................31

## STATEMENT OF RELATED CASES

Counsel for Plaintiff-Appellant is unaware of any cases related to this appeal within the meaning of Federal Circuit Rule 47.5.

/s/ Lewis S. Wiener

## JURISDICTIONAL STATEMENT

The Court of Federal Claims had jurisdiction over this case pursuant to the Tucker Act, 28 U.S.C. § 1491. The order appealed from was a final order dismissing the Second Amended Complaint with prejudice. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUES

1.      Whether the trial court erred in holding that there was no genuine issue of material fact with respect to whether G4S Technology LLC was a third party beneficiary of the contract between Open Range Communications Inc. and the United States Department of Agriculture's Rural Utilities Service.

2.      Whether the trial court erred in construing the Federal Circuit's opinion in *JGB Enterprises, Inc. v. United States*, 497 F.3d 1259 (Fed. Cir. 2007), as conditioning third party beneficiary status on the inclusion in a government contract of a mechanism for joint or direct payment to the subcontractor.

## STATEMENT OF THE CASE

On January 3, 2012, G4S Technology LLC ("G4S") filed an action against the Government in the United States Court of Federal Claims seeking recovery of over $10 million in actual (monetary) damages for the value of materials and services it provided to construct a wireless broadband network in rural communities throughout the United States.[1] G4S alleged that it was a third party beneficiary of a loan agreement between the United States Department of Agriculture's Rural Utility Service ("RUS") and Open Range Communications Inc. ("Open Range") from which the broadband project was to be funded and/or that there was an implied-in-fact contract between G4S and RUS to provide materials and services for the project.[2]

On April 16, 2012, G4S filed a motion for leave to file a Second Amended Complaint ("SAC"), which the court granted. On June 14, 2012, the Government filed a motion to dismiss contending that the SAC should be dismissed pursuant to RCFC 12(b)(1) for lack of subject-matter jurisdiction and pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. The Government argued that G4S had not alleged facts sufficient to show that RUS

---

[1] G4S filed a First Amended Complaint on January 24, 2012. The action was originally assigned to Judge George W. Miller, but was later consolidated with *Alvarion Inc. v. United States*, No. 12-9, and transferred to Judge Nancy B. Firestone. The *Alvarion* action was subsequently settled and dismissed.

[2] G4S subsequently elected not to pursue its implied-in-fact contract claim.

intended the loan agreement to benefit G4S, thus precluding G4S's status as a third

party beneficiary over which the court had jurisdiction. On July 16, 2012, G4S

responded that the SAC's allegations were sufficient as a matter of law for the

court to assert jurisdiction over and adjudicate G4S's claims. G4S requested that

the court deny the Government's motion to dismiss and allow G4S to engage in

merits-based discovery to support its claims, or at a minimum, allow G4S to

conduct reasonable jurisdictional discovery before ruling on the Government's

motion to dismiss. (A326, A355-A357). On October 15, 2012, the court stayed its

consideration of the Government's motion to dismiss, ordered the parties to

conduct "limited" jurisdictional discovery, and set a schedule for post-discovery

briefing prior to the court's ruling on the Government's motion to dismiss. (A417,

A430).

On January 24, 2013, despite the court's October 15, 2012 order permitting

jurisdictional discovery, the Government filed a motion for judgment on the

pleadings or, in the alternative, for summary judgment, and a stay of discovery. In

its motion, the Government argued that (1) the Master Services Agreement

disclaimed RUS's liability for payment to vendors, and (2) Open Range's alleged

default under the loan agreement was a complete defense to G4S's third party

beneficiary claim. In response, G4S requested that the court "convert the

Government's various dispositive motions into a RCFC 56 motion for summary

3

judgment and allow the parties to conduct merits-based discovery prior to

briefing." (A514).   In the alternative, G4S requested that the court deny the

Government's motion for a stay of discovery and allow the parties to proceed with

the jurisdictional discovery and supplemental briefing related to the Government's

motion to dismiss.  (*Id.*)  Following oral argument during a telephone conference

on February 1, 2013,[3] the court issued an order denying the Government's motion

to stay jurisdictional discovery and staying "consideration of the [G]overnment's

motion for judgment until the close of jurisdictional discovery under a schedule

previously ordered and agreed to by the parties." (A549).   In so doing, the court

denied G4S's renewed request to convert the Government's various dispositive

motions into a Rule 56 motion for summary judgment and again denied G4S the

opportunity to conduct merits-based discovery.

On August 7, 2013, following the conclusion of jurisdictional discovery, the

Government filed its supplemental memorandum of points and authorities to

support its motion to dismiss or for judgment on the pleadings or, in the

alternative, for summary judgment.  On August 26, 2013, G4S filed a response to

the Government's supplemental memorandum.  On September 6, 2013, the

Government filed a reply. The court held oral argument on January 14, 2014.  On

February 11, 2014, the court denied the Government's motion to dismiss, holding

---

[3] The February 1, 2013 telephone conference was not recorded.

that G4S had "made a nonfrivolous claim regarding its potential status as a third-party beneficiary." (A2). The court then granted the Government's motion for summary judgment on the merits finding that the "undisputed evidence" did not establish that G4S was an intended third party beneficiary of the Loan Agreement. (*Id.*) On April 10, 2014, G4S timely filed a notice of appeal.

## STATEMENT OF THE FACTS[4]

### A. The Principal Purpose of the Loan Was to Pay Vendors to Construct a Rural Broadband Network.

In 2007, Open Range submitted an application to RUS to qualify for a Rural Broadband Access Loan to fund the construction of a wireless broadband network in hundreds of rural communities ("RUS Markets") located in 17 states ("Project") under the Rural Development Broadband Loan and Loan Guarantee Program. The business plan in the application contemplated a $100 million equity investment from One Equity Partners III, L.P. ("OEP") to fund operating expenses incurred during the course of construction and to fund construction in communities not

---

[4] G4S cites the deposition testimony of the following individuals: Pamela Bennett, RUS Loan Specialist assigned to the Open Range loan; Colin Farmer, OEP's Managing Director during the time period at issue and OEP's RCFC 30(b)(6) designee; Kenneth Kuchno, RUS's Director of the Broadband Division during the time period at issue and RUS's RCFC 30(b)(6) designee; Anthony Tindall, RUS's General Field Representative assigned to the Open Range loan; Chris Edwards, Open Range's Chief Financial Officer during the time period at issue; Paul Schiff, Open Range's Director of Contracts and Capital Budgeting during the time period at issue; Jack Stevens, the RUS Field Auditor assigned to the Open Range loan; and Robert Sommerfeld, G4S's President and CEO.

eligible for RUS funding ("Non-RUS Markets"). (A845-A846 at 44:18-47:3; A658-A659 at 17:22-18:11; A660-A661 at 19:9-20:5; A709 at 93:2-22). OEP's equity commitment was memorialized in a letter from OEP to RUS. (A1336-A1338). On or about March 25, 2008, RUS formally approved Open Range's loan application. (A1619; A1620-1623).

After months of negotiations between and among Open Range, RUS, and OEP related to various aspects of the loan, Open Range and RUS entered into a Loan and Security Agreement ("Loan Agreement") on January 9, 2009 providing that RUS would make a loan to Open Range in the amount of $267,298,000 to finance the construction of a wireless broadband network in 540 RUS[5] Markets. (A1346; A1241-A1242).

The Loan Agreement provided: "Loan Purpose. The Loan has been made solely to finance the project specifically described in the Application." (A1218). The Loan Agreement required, as a condition precedent to loan closing, that Open Range furnish RUS with a build-out plan for the first six months of the Project. (A1219-A1220). The build-out plan that Open Range submitted to RUS prior to loan closing

---

[5] As more fully set forth, *infra*, Open Range subsequently reduced its network to 246 RUS Markets and then further reduced its network to approximately 160 RUS Markets through the Loan Amendment, despite the fact that G4S had already undertaken work in some of the RUS Markets that were subsequently eliminated from the scope of work. At the time of the bankruptcy, on October 6, 2011, Open Range was operating in approximately 153 RUS Markets.

made clear that the Project would be executed by third party vendors, including G4S.

(A1495-A1515).   The introduction to the build-out plan stated:

> [A]ctivities will move forward to achieving final vendor selections and approvals.  Final [third party] vendor selection will begin with development of a Masters Services Agreement (MSA) by Open Range. The MSA will define all hardware, software, and services required of the vendor for a turnkey solution. ***The MSA will be distributed to the RUS for review and comment.***  The MSA will then be distributed to vendors on a timetable for their response and final bid.  During this period, a question and answer session will be made available to the vendors in the event their review of the MSA generates any questions.  Questions and answers, sanitized as to source, will be provided to all vendors.  Vendor responses will be evaluated to determine the response that is most advantageous to the Open Range business plan. ***The selected [third party] vendor response will be reviewed with the RUS, after which Open Range will move to final contract with the vendor.  Once the final vendor is selected, Open Range will work with that vendor for the development of a Plans and Specifications document to be submitted to the RUS for approval.***  (A1496) (emphasis added).

The deposition testimony confirms that RUS knew during the review of the loan application and negotiation of the Loan Agreement that construction of the broadband network would be performed by third party vendors, including G4S, who would be paid from RUS loan proceeds. (A1085-A1086 at 30:11-31:3; A1110 at 77:6-15; A1105 at 118:7-18; A1023-A1025 at 8-10).

## B.     RUS Was Intimately Involved in the Selection, Hiring, Management, and Payment of Vendors, Including G4S.

Subsequent to the loan closing, RUS not only oversaw and controlled the Project, but was intimately involved in the selection, hiring, management, and payment of vendors, including G4S.

## 1. RUS Approved Build-Out Plans Every Six Months.

The Loan Agreement required Open Range to submit build-out plans every six months to RUS for approval. (A1219-A1220). These build-out plans were required to include, among other things, a detailed description of construction by tower site, estimated cost, commencement and completion time frames, and information about the third party vendors who would be responsible for construction. (*Id.*) In conformance with the Loan Agreement, Open Range submitted build-out plans for the entirety[6] of the Project. (A1123-A1124 at 134:21-135:4; A1156 at 345:14-17; A1624-A1627).

## 2. RUS Dictated the Specifics and Details of the Procurement Process.

Pursuant to the Loan Agreement, and by incorporation RUS Bulletin 1738-2,[7] RUS dictated the specifics and details of the procurement process. (A1249-A1280; A1111 at 85:6-19). For example, in response to an e-mail inquiry from Open Range, Farwa Naqvi, Chief of RUS's Engineering Branch responded as follows:

> RUS has no objection to you releasing the RFP to solicit preliminary pricing information from various vendors. However, please keep in mind that this email does not constitute approval of P&S, pricing, and/or contracts as specified in 1738-2. Once preliminary pricing has been

---

[6] RUS approved all the build-out plans except the last one, which was still pending when Open Range declared bankruptcy.

[7] RUS Bulletin 1738-2 was incorporated into the Loan Agreement and is Attachment 1 thereto.

obtained and analyzed, Open Range must submit a detailed outline of
your plans to proceed with procurement before proceeding further with
the procurement process. Also, please be aware, that it is necessary to
have Randy Jenkins and/or Tony Tindall present at the vendor conference;
therefore, you need to coordinate with them prior to scheduling the event.
(A1379-A1381; *see also* A1404-A1408; A1414-A1415; A1409-A1413).

### 3. RUS Reviewed, Revised, and Approved the Master Services Agreement and Contracts Between Open Range and G4S.

Open Range's relationships with the third party vendors it hired to discharge its

obligations under the Loan Agreement were governed by separate Master Services

Agreements ("MSA"). Each MSA established a variety of requirements on third party

vendors and Open Range, including the markets and committed dates, technical

specifications, general scope of work, and pricing. (A1168-A1180). RUS reviewed,

revised, and approved the MSA entered into between Open Range and G4S. RUS sent

a formal letter to Open Range on June 16, 2009 stating:

We have reviewed the Master Services Agreement (MSA) that covers the
services to be provided by the Deployment Service Partners. We have no
objection to you releasing the MSA for bids. If there are any changes to
the MSA, you must submit them for our review prior to incorporating
them in the agreement. Please provide us with an executed copy of the
MSA from each of the Deployment Service Partners. (A1384; *see also*
A1382-A1383).

Ken Kuchno, Director of RUS's Broadband Division, testified and admitted as

RUS's 30(b)(6) designee that the letter constituted formal approval[8] of the MSA for

---

[8] Although RUS did not formally approve the executed version of the MSA between
Open Range and G4S, the executed version is materially the same as the approved
generic version, except for details specific to each deployment service partner. (*See*
A1127-A1128 at 187:15-188:3; A1132-A1122 at 115-116, A1150 at 132).

deployment service partners, a group of vendors that included G4S.  (A1126 at 186:11-22; A1129-A130 at 192:22-193:10; A1131 at 222:19-21; *see also* A1310; A1615-A1316; A1317).

Pursuant to the G4S MSA, Open Range entered into two types of agreements with G4S for provision of materials and services in RUS Markets—Form 245 Agreements (large-scale construction contracts) and Form 773 Agreements (small-scale construction work orders).  (A1168).  RUS formally approved in writing all large-scale construction contracts between Open Range and G4S for work in RUS Markets. (A1490-1493; A1385-1391 & A1451-1474; A1426-1449; A1475-A1489).  Each of the contracts that RUS officially approved in writing explicitly set forth the scope of work that G4S would undertake and the fees it would charge.  (*Id.*)  RUS directly informed G4S when a contract had been approved and funds had been encumbered. (A1151 at 312:12-15).

Pursuant to the MSA, Open Range also entered into purchase orders with G4S for provision of materials and services in Non-RUS Markets.  (A1168).  The MSA, however, included different "Invoicing and Payment" provisions for RUS Markets and Non-RUS Markets.  With respect to RUS Markets, the MSA provided: "Invoicing and payment shall be completed in accordance with RUS Forms 245 and 773, as applicable, and RUS regulations.  It is understood that Owner shall not be required to remit amounts to DSP until thirty (30) days following receipt of such funds by Owner from

RUS.  Such payment provision shall not release Owner from its payment liability to

DSP." (A1172).  With respect to Non-RUS Markets, the MSA provided:  "DSP shall

render an invoice in accordance with each PO and the terms of this Agreement.

Invoices shall be submitted to the Owner address stated on the PO.  Invoices shall have

a due date forty five (45) days after receipt by Owner." (A1172).  In addition, the MSA

provided that "RUS is not liable for payment on any P[urchase] O[rder]." (A1173).

As a condition of allowing Open Range to include contract provisions for Non-

RUS Markets within the MSA governing RUS-Markets, RUS required Open Range to

include specific language (referenced above) stating that it would not be liable for

payment of work performed in any Non-RUS Markets in section 7.G.  (A1046 at 61:2-

20).  This provision did not apply to work performed in RUS Markets.[9]

### 4. RUS Made Sure That RUS Funds Were Used Only to Pay for Approved Vendor Work and Was Involved on a Day-to-Day Basis in the Vendor Payment Process.

The Loan Agreement required Open Range to establish a segregated deposit

account ("Pledged Deposit Account") into which the RUS loan proceeds would be

deposited to ensure that RUS funds were used only for approved purposes.  (A1222-

A1223; A1272).  Open Range was required to submit financial requirement statements

---

[9] Paul Schiff of Open Range testified that although purchase orders were sometimes used in RUS and Non-RUS markets due to a shared network, this was not contemplated under the MSA and should not have been the case.  (A1046-A1047 at 61:2-62:13).

("FRSs") to RUS to request advances under the Loan Agreement. (A1273). RUS assisted Open Range in the preparation of the FRSs, and provided guidance to Open Range as to which charges to include in the FRSs. (A1090 at 22:5-9). All monies funded by RUS in response to the FRSs were disbursed into the Pledged Deposit Account and were to be used "solely for the purpose approved in the loan application," which purpose included paying vendors, and "shall be withdrawn from time to time only as agreed to by RUS." (A1272). RUS advanced funds based on FRSs that explicitly referenced G4S contracts. (A1426-A1449; A1159-A1150 at 364:20-365:9). RUS also authorized funding of small-scale construction work orders after reviewing the FRSs and accompanying documentation. (A1090-A10940 at 22:2-26:1). Specifically, an FRS had to be accompanied by a Form 771(a), which is a detailed summary of the work orders with supporting documentation, including specific vendor invoices. (*Id*). Tony Tindall, RUS's General Field Representative assigned to the Open Range loan, was responsible for the initial review, and he would sign and date the Form 771(a) prior to Open Range sending the FRS to the RUS Engineering Branch in D.C. if he thought it should be approved for funding. (A1090-A1094 at 22:2-26:1; A1517-A1615).

RUS performed periodic audits of Open Range's Pledged Deposit Account, known as a Loan Fund Accounting Review ("LFAR"), to ensure that the funds RUS disbursed to Open Range were used to pay vendors. (A1082-A1083 at 36:17-37:6;

A1117-A1118 at 119:9-120:17; A1347-A1349).  RUS conducted two LFARs of Open
Range: January 9, 2009 to September 30, 2009 and October 1, 2009 to September 31,
2011.  (A1080-A1081 at 16:16-17:10).

### 5.  There Was Constant Communication Between and Among Open Range, RUS, and Vendors.

RUS and Open Range were in constant communication regarding vendors'
construction of the broadband network.  Tony Tindall regularly visited Open Range for
several days at a time to train Open Range employees on RUS "contracting
construction procedures," review vendor contracts for conformance with RUS rules,
and help Open Range prepare FRSs seeking advances for vendor payments. (A1088-
A1089 at 15:7-16:22; A1090 at 22:5-9).  During some of his field visits, Mr. Tindall
attended conferences between Open Range and vendors. (A1379-A1381; A1104 at
107:9-10; A1125 at 138:2-14).  Specifically, Mr. Tindall testified: "I recall attending a
couple of different meetings with vendors.  One of them was specifically related to
customer premise equipment, and the other was specifically related to deployment
services." (A1110 at 44:14-18).  This is consistent with the testimony of Robert
Sommerfeld, President and CEO of G4S, that he and other G4S personnel attended
Open Range vendor meetings where RUS personnel were also in attendance that were
"focused around progress reporting and status updating and how many sites and/or
markets were completed last month and how many more were going to be completed
the following month or any schedule issues." (A1069 at 76:9-17).  Although Open

Range held vendor conferences that RUS did not attend, RUS reviewed and questioned Open Range about presentations it planned to give to the vendors during the conferences. (A1152-A1154 at 319:3-321:3). In short, RUS was involved in virtually every aspect of the vendor relationship.

After each visit to Open Range, Mr. Tindall composed a field activity report that he sent via e-mail to Ken Kuchno, addressing, among other things, payment issues related to vendors. (A1096-A097 at 30:5-31:22). Weekly conference calls were also held between Open Range and RUS personnel in D.C., during which specific vendors and vendor contracts were discussed. (A1098-A1099 at 33:20-34:22; A1617; A1181). RUS personnel were not permitted to attend Open Range board meetings, but meeting reports and minutes were distributed to RUS. (A1404-1408; A1119-1120 at 122:13-123:5; A1121-A1122 at 129:17-130:7). Moreover, Open Range sent RUS weekly status reports that discussed the work vendors were performing and highlighted concerns related to vendors. (A1026 at 31:12-25; A1155 at 330:20-21; A1188 at 356:14-357:5).

RUS also engaged in direct communication with certain vendors regarding payment issues, among other things. Ken Kuchno testified that: "[T]here would have always been constant contact between RUS and the vendors to get their equipment listed as acceptable materials for funding. . . . They may have questions about certain procedures and contract requirements that they run into and they would come to us for

clarification." (A1113-A1115 at 103:9-105:10; *see also* A1425).  Mr. Kuchno further testified that it was not uncommon for vendors to participate in meetings with RUS and the borrower "[i]f the meeting were revolving around the equipment that they were providing." (A1113 at 97:18-22; *see also* A1336-A1338).  Mr. Kuchno further testified that "[v]endors occasionally from time to time call about not receiving payments on time." (A1116 at 108:4-5).

### 6.      A Variety of Unique Circumstances Resulted in Arrearages Owed to Vendors, Including G4S.

In July 2010, the Federal Communications Commission ("FCC") suspended Globalstar's permit to operate ATC spectrum, which meant Open Range, a licensee of Globalstar, also lost its access to the spectrum necessary to provide broadband service.  RUS then suspended funding to Open Range, which meant all payments to vendors were suspended, even for work that had already been completed. (A852).  Vendors, including G4S, complained to Open Range and RUS that they were not being paid for work performed on the Project and threatened to stop work going forward.[10]

---

[10] (A1339-A1340) (Sept. 15, 2010 e-mail from Open Range representative to RUS officials stating in relevant part, "Vendors are seeking immediate payment of bills from Open Range.");  (A1417-A1420) (Sept. 23, 2010 e-mail from Q. Saeed of Open Range to Lindsay Daschle of USDA stating "vendors and partners are just about to stampede"); (A1043-A1044 at 48:7-49:9) ("I believe Chris Edwards and Bill [Beans], you know, chatted to the RUS or with their attorneys about trying to keep the funding moving.").

After the FCC granted Open Range a Special Temporary Authority ("STA"), which RUS helped it to obtain and which allowed Open Range to operate the ATC spectrum in 264 of the 540 markets included in the Loan Agreement, RUS sent Open Range a letter formally lifting the suspension of funding with respect to those 264 markets and making specific assurances regarding funding for arrearages owed to vendors for work performed in June and July of 2010. (A850-A851). Specifically, in its September 23, 2010 letter to Open Range, RUS stated:

> With the reduction of a significant number of communities and subscribers that can no longer be served, the RUS and Open Range must reach an agreement on an acceptable loan amount sufficient to cover the Approved Communities. Until such agreement, the RUS has authorized the immediate release of the present in-house advance request for $14 million and the additional request for $5 million which we understand will be submitted shortly. The RUS is committed to expeditiously analyzing the financial projections provided to RUS on September 16, 2010, which address building out only Approved Communities, so that normal advances on these communities can continue. (A850).

RUS intended this letter to be publicly released to calm vendor fears so that there would be no disruption to continued work on the Project. Specifically, in response to an e-mail inquiry from Q. Saeed of Open Range, Lindsay Daschle, Assistant to the Secretary of USDA, responded: "I think at this point our team feels the [September 23, 2010] letter will serve as the press release and we will continue to talk to anyone (vendors, press, etc.) who we need to help calm fears and rebuild credibility. Jonathan [Adelstein] can talk to whomever you'd like in this regard."

(A1419-A1420).  On October 4, 2010, however, Alfred Mottur, a lobbyist

representing Open Range, sent David Villano, RUS's Assistant Administrator, and

other RUS officials, an e-mail relaying vendors' continuing concerns:

> [O]RC has a number of vendors requesting that ORC give them
> assurances that RUS funding has been re-opened and it not currently
> curtailed.  They are most concerned due to the information in the
> press that indicates that advances were suspended on July 14 and there
> has been no public notice that this has been modified.  These vendors
> include **[G4S]**, Velocitel, Blackdot, and SAC.  They have asked to see
> written confirmation that the RUS is continuing to fund on an on-
> going basis.  As an alternative that they have requested a conversation
> with the RUS. (A1416) (emphasis added).

Mr. Villano responded that RUS would work with Open Range to address

vendors' concerns through a conference call:

> Thanks for your e-mail and we do understand the challenges facing
> Open Range with regard to vendors at this time.  As you know, we are
> meeting with the Open Range folks tomorrow morning.  I trust our
> mutual goal at this meeting is determine a timeline and path forward
> for Open Range.  We believe that a conference call with vendors after
> that meeting would best address this issue.  RUS staff will schedule a
> time and bridge # for any of Open Range's vendor's to call-in for the
> latest information.  Those that cannot participate in the conference call
> will be given an opportunity to speak to a member of my staff
> separately.  In this manner, all vendors can hear the same message at
> the same time. (*Id.*)

Mr. Mottur replied to Mr. Villano that he believed vendors needed

something more concrete than a conference call:

> Unfortunately, ORC is in a tougher spot than perhaps you imagine.
> The $14 million dispersed was for work done in June and July.  The
> extra $5 million yet to be dispersed was for work done in July and
> August.  And yet the company has been building out in numerous

markets incurring significant costs pursuant to its negotiated deal with
the FCC which we understood you supported. The position taken in
your letter from a legal perspective prohibits ORC from assuring its
vendors they will be paid to complete the work agreed to pursuant to
the deal referenced above. (*Id*.)

In response to Mr. Mottur's request on behalf of Open Range's vendors for

more specific assurances that RUS would fund the Project going forward, RUS

sent out two letters to Open Range on October 8, 2010 formally approving funding

for an updated build-out plan, which included 246 RUS Markets. (A1421-A1423;

*see also* A1417-A1418). One of the letters specifically stated that "the cost of

deployment for the 246 RUS-funded markets is approximately $102 million, of

which approximately $43 million has been advanced to date and the remaining $59

million will be requested for facilities and services proposed during this build-out

period." (A1423).

Despite these assurances, RUS ultimately did not fund the ongoing vendor

work performed in the 246 RUS markets identified in the October 8, 2010 letters.

(A610). RUS's failure to fund vendors' continued work on the Project resulted in

increasing arrearages to vendors, including G4S. (A1341-1345). On March 11,

2011, Open Range sent RUS a weekly status report with the following information:

The situation with our vendors is becoming critical. Alvarion is
considering whether they should stop shipping additional equipment.
Certain vendors are discussing the issuance of contract default notices
as well as threats of equipment liens. Liens are mounting and all of
the vendors are extremely nervous about extending their commitment
to this project. This would halt all of the positive momentum that we

18

have been able to show over the last 60 days in quality cost management and network deployment.  We are attempting to manage the cash reserves of the Company as aggressively as possible but need assistance from the RUS within the next 7 days particularly as many providers cannot understand why contracts that were submitted over 90 days ago still have not been approved for work that has been completed. (A1188).

The weekly status report included a chart identifying "$25mm of funds that are owed . . . for RUS eligible expenses both as carry over from 2010 and 2011 activity," and specifically setting forth a $2.6 million "backlog" of payments owed to "[G4S]." (A1189).   Thus, as of March 2011, both Open Range and RUS were aware that the continued viability of the Project was in jeopardy as vendors, including G4S, were threatening to stop work on the Project if they did not receive immediately past due payments.

> **7.     Open Range, RUS, and OEP Entered into the Loan Amendment, Equity Commitment Letter, and RUS/OEP Agreement to Memorialize RUS's Obligation to Fund Arrearages Owed to Vendors and Payments Going Forward.**

Due to the ongoing funding issues, Open Range requested that the parties formally memorialize RUS's obligation to fund both vendor arrearages and vendor payments going forward, thereby ensuring the continued build-out of the Project.[11]

---

[11] (A841 at 84:3-6) ("My recollection was that [Open Range] and the agency were trying to create some more certainty by having an amendment which – which would govern their relationship going forward); (A1041 at 43:8-12) (stating that Loan Amendment was entered into because "we were having funding delays from the RUS to pay our contractors for the capital program"); (A1054-A1055 at 93:17-94:4) (stating that it was Open Range's intent in entering into the Loan Amendment to ensure that the RUS advanced funds to pay vendors who had performed work on the Project and that Open Range disclosed this intent to RUS).

As a result, Open Range, RUS, and OEP negotiated an amendment to the Loan Agreement. (A1027 at 39:11-14; A1054-A1055 at 93:5-94:20; A1138-A1139 at 62:20-63:19; A1031 at 44:17-18; A1056-A1057 at 95:15-96:4; A1142-A1146 at 67:8-71:7). RUS agreed specifically to fund arrearages owed to vendors as well as advances for future vendor work performed in 160 of the original 540 RUS Markets (thereby reducing the loan amount from approximately $267 million to $180 million) on the condition that OEP agree to invest $40 million in Open Range to cover operating expenses that could not be covered by the RUS loan. Similarly, OEP agreed to further invest in Open Range on the condition that RUS agree to fund vendor arrearages and future advances for vendor work performed in 160 of the original 540 RUS markets. (A1137 at 61:15-18; A1028 at 40:5-9; A1052-A1053 at 90:14-91:10). This agreement was memorialized in an Amendment to Loan and Security Agreement dated April 29, 2011 between Open Range and RUS ("Loan Amendment"),[12] which incorporated an Equity Commitment Letter from OEP as an exhibit and provided that it was conditioned upon "[r]eceipt of a fully executed letter, in form and substance identical to Exhibit B hereto, from OEP to the Borrower, dated as of even date herewith, committing to capitalize OEP Open

---

[12] The Loan Amendment was also made an exhibit to the Equity Commitment Letter. (A1208).

Range Holdings, LLC, subject to the conditions contained in such letter, with an equity contribution of up to $40,000,000." (A1199).

The Equity Commitment Letter, dated April 29, 2011, was signed by both OEP and its subsidiary OEP Open Range Holdings, LLC (the principal investor in Open Range) and stated that OEP would invest the first $10 million when RUS: (1) entered into the draft Loan Amendment with Open Range to reduce the network from 540 markets to 160 markets and allow Open Range to operate under STAs; (2) funded advances identified in Schedule B-1, for work that had been performed by vendors for Open Range, such as G4S, under previously approved contracts; and (3) agreed to approve for advance those vendor contracts identified in Schedule B-2 once the conditions set forth were satisfied by Open Range. (A1204-A1210; A679-680 at 65:12-66:20; A698-A700 at 39:3-41:13). Open Range and RUS (specifically Ken Kuchno) worked together to draft schedules B-1 and B-2 to the Equity Commitment Letter. (A1424; A1028-A1029 at 40:22-41:13; A1161-A1162 at 387:10-388:1; A1166-A1167 at 401:5-402:8).

The Loan Amendment also incorporated an agreement between RUS and OEP, dated April 29, 2011, that ensured that OEP Open Range Holdings, LLC would invest in Open Range the funds advanced by OEP under the Equity Commitment Letter ("RUS/OEP Agreement"). (A1318-A1321). The Loan Amendment provided that it was conditioned on "[r]eceipt by the RUS of an

executed agreement among OEP and the RUS, dated as of April 29, 2011, regarding the subject matter of the Event of Default described in Section 9.1(n) hereof." (A1199). The RUS/OEP Agreement in turn incorporated the Equity Commitment Letter as part of its "Affirmative Covenants." (A1319).

As set forth above, the Loan Amendment, Equity Commitment Letter, and RUS/OEP Agreement, which were executed on the same day and involve the same transaction, are inextricably intertwined and are dependent upon each other. Moreover, there is no dispute that based on this transaction, RUS was obligated not only to fund the arrearages set forth in Schedule B-1 and advances set forth in Schedule B-2, but also advances for future work performed by vendors in the identified 160 RUS markets. (A1030 at 43:1-6; A1042 at 46:1-19; A1055 at 94:6-9; A1162-A1165 at 388:8-390:2).

During the negotiation of the Loan Amendment, Equity Commitment Letter, and RUS/OEP Agreement, Chris Edwards of Open Range communicated with Robert Sommerfeld of G4S and informed him that, as a result of the negotiations, "RUS will fund Open Range draw/request within 30 days" and "Open Range will pay [G4S] to current within 48 hours after receipt of RUS funds." (A1322-A1323; A1032-A1033 at 45:15-46:13; A1062-A1068 at 50:6-56:4; *see also* A1048 at 64:9-15).

## 8.   RUS's Failure to Follow Its Own Procedures Resulted in Continued Arrearages Owed to Vendors, Including G4S.

Separate and apart from RUS's intermittent suspensions of funding resulting from Open Range's spectrum issues, RUS's failure to follow its own regulations and guidelines further led to non-payment of vendors.  RUS Bulletin 1738-2 required that "[u]nless otherwise approved by RUS [Open Range] shall finance small-scale construction with general funds and obtain reimbursement with loan funds when construction is completed and properly executed closeout documents have been submitted to RUS." (A1259-A1260). This conflicted with the terms of the RUS-approved MSA between G4S and Open Range that provided G4S would be paid for work performed in RUS Markets after RUS advanced the funds to Open Range. (A1172).  Despite knowing about (and creating) this conflict, RUS failed to ensure Open Range's compliance with RUS Bulletin 1738-2. Specifically, Tony Tindall unambiguously informed Ken Kuchno of this conflict on March 22, 2011, but suggested no remedy:

> Velocitel – Due to a conflict between the language in the MSA and RUS small-scale construction procedures, Velocitel and ORC seem to be at an impasse.  RUS procedures dictate that the vendor be paid-in-full prior to the borrower drawing down funds.  The MSA indicates that the vendor will not be paid-in-full until funds are available from the RUS.  How this issue gets resolved remains to be seen. (A1395-A1396).

Mr. Tindall repeated his concern to Mr. Kuchno on April 3, 2011, admitting that the procedures detailed in RUS Bulletin 1738-2 were not followed, but stated

that it was a problem to be worked out between Velocitel and Open Range, despite

RUS's role in creating the problem:

> Velocitel Work Orders – My concern is not that an overall settlement
> agreement be reached with Velocitel; (although I think that's a great
> idea) it's that small-scale construction procedures are not being
> properly followed.  Open Range could produce neither a clean Form
> 743, nor evidence that the vendor had been paid.  The fact that the
> terms and conditions of the MSA are in direct conflict with RUS
> small-scale construction procedures is an issue that needs to be
> resolved by the owner and the vendor. (A1397-A1399).

Despite raising the issue on March 22 and April 3, no action was taken until

one month later, when Mr. Tindall sent an e-mail to Open Range summarizing the

RUS perspective on small-scale construction procedures:

> All small-scale construction contracts included on RUS Form 771a
> must be supported by a final invoice, an executed RUS Form 743, and
> evidence of final payment.  Some projects may require RUS
> inspection to verify completion. (A1401-A1403).

Notwithstanding this directive, there is no evidence that RUS required Open

Range to demonstrate evidence of final payment. (A1103 at 85:6-10).

Upon discovery of Open Range's inability to finance with general funds,

RUS was required to implement work order funds pursuant to RUS Bulletin 1738-

2. (A1259).  Instead of following the Loan Agreement and its requirements, RUS

allowed Open Range to have vendors, including G4S, unwittingly finance the

Project. (A1391-A1394; A1036 at 20:7-17; A1102 at 75:1-15).

Because Velocitel was unable to pay its subcontractors, it confronted RUS at an earlier date than G4S and brought a lawsuit against Open Range seeking payment for work performed pursuant to small-scale construction work orders. (A1050 at 60:3-11; A1166 at 108:6-10). Open Range settled the lawsuit with Velocitel, and RUS ultimately funded the amounts that were due Velocitel as claimed in the lawsuit. (A1106-A1107 at 130:15-131:14). Essentially, RUS paid for the settlement.

RUS, however, continued to be aware that vendors, including G4S, were not being paid for work performed on the Project pursuant to small-scale construction work orders. RUS's October 4, 2011 LFAR report states that vendor contracts were not being timely closed out, i.e., paid.

> Contracts are not being closed in a timely fashion. As of May 31, 2011, only two of twenty five open contracts in the amounts of $173,995 and $525,000 have been closed out. This represents approximately 1% of the total loan funds advanced during the last two and a half years. Not timely closing out contracts raises the risk that unpaid vendors could force Open Range into costly litigation or even involuntary bankruptcy.

> * * *

> Contracts must be closed in a timely manner to ensure that costs related to vendor construction are accurately accounted for and supported in the books and records of the Company. Closing of contracts in a timely manner also ensures that amounts financed by RUS have been reconciled to amounts actually disbursed and can be properly supported by vendor invoices. In addition, Open Range must set aside on its books adequate reserves to cover the dispute with Velocitel and any other vendors. (A1355).

## SUMMARY OF ARGUMENT

The trial court erred in entering summary judgment in favor of the
Government on G4S's third party beneficiary claim.  First, the court erred in
holding that there was no genuine issue of material fact with respect to whether
G4S was a third party beneficiary of the contract between RUS and Open Range.
The court concluded in error that RUS merely oversaw vendor work on the Project,
despite clear evidence that RUS was intimately involved in the selection, hiring,
management, and payment of vendors.  The court also concluded in error that RUS
intended merely to make funds available for Open Range to pay its vendors as it
saw fit, despite clear evidence that RUS intended to ensure that specific vendors,
including G4S, were actually paid for the work they performed on approved
contracts.  Accordingly, G4S raised genuine disputes as to material facts
underlying its third party beneficiary claim.

Second, the trial court erred in creating a new standard for establishing third
party beneficiary status that is contrary to Federal Circuit precedent.  Despite
guidance from the Federal Circuit that third party beneficiary status may be based
on the implied intention of the contracting parties to directly benefit the third-party,
the trial court held that "for a subcontractor to obtain the status of an intended
third-party beneficiary, it must provide clear evidence that an authorized
government official approved a contract provision for the express purpose of

effectuating payment from the government to the subcontractor," which requires a direct or joint payment mechanism. (A22, A24) (emphasis in original). The trial court further erred in holding that the nature and extent of government "involvement" and "oversight" of a subcontractor are irrelevant to determining whether a subcontractor is a third party beneficiary of a government contract. There is simply no basis in Federal Circuit precedent for the trial court's narrow construction of the third party beneficiary standard. Accordingly, the trial court erred as a matter of law in granting summary judgment in favor of the Government.

## **ARGUMENT**

### I. **Relevant Legal Standards**

The Federal Circuit reviews "de novo the grant of summary judgment by the Court of Federal Claims, 'drawing justifiable factual inferences in favor of the party opposing the judgment' and reapplying the standard applicable to proceedings before the Court of Federal Claims." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (quoting *Long Island Savs. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed. Cir. 2007)).

Pursuant to RCFC 56, summary judgment is appropriate when the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  RCFC 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001).  In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted); *see also Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1362 (Fed. Cir. 2009).  A fact is "material" if it "might affect the outcome of the suit"; a dispute is "genuine" if the evidence is such that a reasonable trier of fact could find "for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.  Similarly, "[i]n cases in which there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant." *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984).

Accordingly, the Federal Circuit must review "without deference" both whether a genuine issue of material fact existed in the proceedings below and whether the Government was entitled to judgment as a matter of law.  *Lakeshore Engineering Services, Inc. v. United States*, 748 F.3d 1341, 1346 (Fed. Cir. 2014).

## II.   The Trial Court Erred in Holding That There Was No Genuine Issue of Material Fact With Respect to Whether G4S Was a Third Party Beneficiary of the Loan Agreement Between RUS and Open Range.

In the proceedings below, G4S demonstrated that the terms of the Loan Agreement, as amended, and the dealings between the parties established that RUS intended specifically that vendors be paid for Project-related materials and services.[13]  Based on this record, the trial court should have denied the Government's motion for summary judgment on G4S's third party beneficiary claim.

To support its grant of summary judgment in the Government's favor, the trial court stated that it "assumed the facts that G4S asserts." (A25 n.15).  A

---

[13] The trial court prematurely entered summary judgment against G4S without allowing it to conduct full discovery on the merits of its third party beneficiary claim.  As set forth in the Statement of the Case, G4S repeatedly requested full merits-based discovery prior to the court's summary judgment ruling, and its requests were repeatedly denied.  "The Supreme Court has made clear that summary judgment is inappropriate unless a tribunal permits the parties adequate time for discovery." *Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919 (Fed. Cir. 1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)).  As a general matter, the Federal Circuit will reverse the trial court's denial of additional discovery if the denial resulted in "actual and substantial prejudice to the complaining litigant." *Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1370 (Fed. Cir. 2007) (internal quotation and citation omitted).  Furthermore, G4S was not properly put on notice that the court planned to evaluate the merits of its case as if G4S had affirmatively moved for summary judgment (which it did not), and thus did not have the opportunity to present all facts and arguments in support of its third party beneficiary claim. *Compare with In Burnside-Ott Aviation Training Center, Inc. v. United States*, 985 F.2d 1574, 1582-83 (Fed. Cir. 1993) (holding that although plaintiff was put on notice that court intended to consider the Government's motion to dismiss as a motion for summary judgment and should come forward with all its evidence, summary judgment was improperly granted because the plaintiff was not given an adequate opportunity for discovery).

review of the record and the trial court's opinion, reveals, however, that the trial court did **<u>not</u>** assume all material facts in favor of G4S, and there remain genuine issues as to material facts underlying G4S's third party beneficiary claim that compel reversal of the trial court's grant of summary judgment in the Government's favor.

The trial court held that it would not "infer that the government intended to directly benefit the subcontractor merely because an authorized government official (1) oversees the activities of the prime contractor; (2) becomes aware that the prime contractor has failed to timely pay its subcontractors, and/or (3) makes funds available to the prime contractor in order for the prime contractor to pay its subcontractors." (A23). Here, the trial court ignored that there was a genuine issue as to whether (1 above) RUS merely oversaw the activities of Open Range, and whether (3 above) RUS merely made funds available for Open Range to pay vendors, including G4S.

As set forth below, G4S presented evidence to show that RUS did not merely oversee Open Range's activities, but rather was intimately involved in the selection, hiring, management, and payment of vendors:

- In addition to the initial build-out plan, Open Range submitted build-out plans to RUS for approval every six months that included, among other things, a detailed description of construction by tower site, estimated cost, commencement and completion time frames, and the workforce that would be carrying out the construction.

- RUS dictated how the vendor procurement process was carried out, including requiring RUS approval of requests for vendor proposals, vendor plans and specifications, vendor pricing, and vendor contracts.

- RUS reviewed, edited, and formally approved in writing the MSA that was entered into between Open Range and G4S. RUS also reviewed and approved the individual contracts between Open Range and G4S that fell under the MSA, each of which set forth the scope of work that G4S would perform and the fees it would charge. RUS directly informed G4S when a contract had been approved and funds encumbered.

- RUS required Open Range to establish the Pledged Deposit Account, to use funds in that account "solely for the purpose approved in the loan application," and to withdraw funds "only as agreed to by RUS." RUS assisted Open Range in the preparation of FRSs seeking advances, and provided guidance to Open Range as to which charges to include in the FRSs. The FRS's listed the vendor contracts and work orders by name and were supported by vendor invoices and other vendor documentation. RUS performed periodic audits of Open Range's Pledged Deposit Account to ensure that the funds RUS advanced to Open Range were used to pay vendors.

- A RUS Field Representative regularly visited Open Range for several days at a time to train Open Range employees on RUS "contracting construction procedures," review vendor contracts for conformance with RUS rules, help Open Range prepare FRSs seeking advances for vendor payments, and attend vendor conferences. RUS's Engineering Branch received weekly status reports from Open Range and participated in weekly conference calls with Open Range to discuss vendor contracts, progress, and payments. RUS also had direct communication with vendors regarding procedural matters and payment issues.

Based on this evidence , a reasonable trier of fact could (and should)

conclude that RUS did more than merely oversee[14] the Project. More than

---

[14] The Merriam Webster dictionary defines "oversee" as "to watch and direct (an activity, a group of workers, etc.) in order to be sure that a job is done correctly." *Merriam-Webster.com.* Retrieved July 9, 2014, from http://www.merriam-webster.com/dictionary/oversee.

directing from the sidelines, RUS was involved at nearly every stage of the vendor relationship, including approving specific work to be performed by G4S under specific contracts, assisting Open Range in the preparation of FRSs seeking advances to pay G4S, advancing specific funds based on G4S invoices into a segregated account for vendor payments, and participating in weekly conference calls with Open Range to discuss vendor contracts, progress, and payments. Because a reasonable trier of fact could conclude that RUS did not merely generally oversee the Project, but was directly involved in the selection, hiring, management, and payment of vendors, including G4S, G4S raised a genuine issue of material fact that should have precluded summary judgment.

The trial court further erred in holding that there was no genuine issue of material fact with respect to whether "an authorized RUS official[15] intended to do anything but pay Open Range so that Open Range had sufficient funds to carry out its plan of constructing a rural broadband network." (A24). As set forth below, G4S presented evidence to show that RUS specifically intended to ensure that

---

[15] The trial court stated in a footnote that "Plaintiff has not identified—and the court is unaware of—any RUS officials other than Mr. Adelstein and Mr. Kuchno whose intent to benefit Open Range's vendors would be relevant to resolving the government's Motion for Summary Judgment." (A23 n.13). This statement is error because G4S also identified RUS's Assistant Administrator David Villano. In any event, letters, e-mails, and other communications from any RUS official can be evidence of the intent of Messrs. Adelstein and Kuchno to the extent that (1) Messrs. Adelstein and Kuchno were part of a team or collective body with the same intent; and/or (2) the RUS official was communicating on behalf of Messrs. Adelstein and/or Kuchno.

vendors were paid for work performed on the Project, including for specific

arrearages:

- RUS required Open Range to establish the Pledged Deposit Account, to use funds in that account "solely for the purpose approved in the loan application," and to withdraw funds "only as agreed to by RUS." RUS performed periodic audits of Open Range's Pledged Deposit Account to ensure that the funds RUS advanced to Open Range were used to pay vendors.

- In response to vendor complaints that they had not been paid, RUS sent a September 23, 2010 letter to Open Rage in which it authorized "immediate release of the present in-house advance request for $14 million and the additional request for $5 million which we understand will be submitted shortly" and "committed to expeditiously analyzing the financial projections . . . so that normal advances on [Approved Communicates] can continue." (A850). As set forth in an e-mail from Lindsay Daschle, Assistant to the Secretary of USDA, to Open Range, RUS intended this letter to act as a public statement and press release to calm vendor fears so that there would be no disruption to continued work on the Project: "I think at this point our team feels the [September 23, 2010] letter will serve as the press release and we will continue to talk to anyone (vendors, press, etc.) who we need to help calm fears and rebuild credibility. Jonathan [Adelstein] can talk to whomever you'd like in this regard." (A1419-A1420).

- In response to an October 4, 2010 e-mail from an Open Range representative relaying vendors' concerns about not being paid, David Villano, RUS's Assistant Administrator, responded that RUS would work with Open Range to address vendors' concerns through a conference call. Mr. Mottur replied to Mr. Villano that he believed vendors needed something more concrete than a conference call. In response to Mr. Mottur's request on behalf of Open Range's vendors for more specific assurances that they would be paid for their work on the Project going forward, RUS sent out two letters to Open Range on October 8, 2010, one of which specifically stated that "the cost of deployment for the 246 RUS-funded markets is approximately $102 million, of which approximately $43 million has been advanced to date and the remaining $59 million will be requested for facilities and services proposed during this build-out period." (A1423).

- On January 11, 2011, Open Range e-mailed Mr. Kuchno (and copied Mr. Adelstein) seeking funding of a G4S contract that RUS had verbally approved before the end of the year. The next day, Mr. Adelstein wrote to Mr. Kuchno about setting up a meeting to respond to Open Range, stating: "Why wait until Wednesday? They seem to be concerned about getting paid now. I get there are issues, but can't we get to the bottom of it sooner?" (A1341).

- On March 11, 2011, Open Range sent RUS a weekly status report setting forth a $2.6 million "backlog" of payments owed to "[G4S]" and stating that the continued viability of the Project was in jeopardy as vendors were threatening to stop work on the Project if they did not receive past due payments. (A1188-A1189).

- Due to the ongoing funding issues, Open Range requested that the parties formally memorialize RUS's obligation to fund both vendor arrearages and vendor payments going forward, thereby ensuring the continued build-out of the broadband network.

- The Loan Amendment, Equity Commitment Letter, and RUS/OEP Agreement were part of the same transaction, which obligated RUS not only to fund the arrearages set forth in Schedule B-1 and advances set forth in Schedule B-2, but also advances for future work performed by vendors in the identified 160 RUS markets. Schedules B-1 and B-2 set forth specific vendor contracts and amounts owed.

- During the negotiation of the Loan Amendment, Equity Commitment Letter, and RUS/OEP Agreement, Chris Edwards of Open Range communicated with Robert Sommerfeld of G4S and informed him that, as a result of the amendment, "RUS will fund Open Range draw/request within 30 days" and "Open Range will pay [G4S] to current within 48 hours after receipt of RUS funds." (A1322-A1323).

- RUS's October 4, 2011 LFAR report stated that vendor contracts were not being timely closed out, i.e., paid and identified this as an action item for Open Range:

> Contracts are not being closed in a timely fashion. As of May 31,
> 2011, only two of twenty five open contracts in the amounts of
> $173,995 and $525,000 have been closed out. This represents
> approximately 1% of the total loan funds advanced during the last
> two and a half years. Not timely closing out contracts raises the
> risk that unpaid vendors could force Open Range into costly
> litigation or even involuntary bankruptcy.
>
> * * *
>
> Contracts must be closed in a timely manner to ensure that costs
> related to vendor construction are accurately accounted for and
> supported in the books and records of the Company. Closing of
> contracts in a timely manner also ensures that amounts financed by
> RUS have been reconciled to amounts actually disbursed and can
> be properly supported by vendor invoices. In addition, Open
> Range must set aside on its books adequate reserves to cover the
> dispute with Velocitel and any other vendors. (A1355).

Based on this evidence, a reasonable trier of fact could (and should)
conclude that RUS intended to ensure that vendors, including G4S, were paid for
the work they performed in good faith on the Project. If RUS merely intended to
"pay Open Range so that Open Range had sufficient funds to carry out its plan of
constructing a rural broadband network" (A24), RUS would not have (1) created a
segregated account into which it disbursed funds earmarked for certain vendor
contracts, (2) required detailed documentation of the work performed and
payments owed to vendors, and (3) closely monitored Open Range's payments to
ensure that RUS funds were actually used to pay vendors for the contracts that
were the basis of the advances. Moreover, the situation involving vendor
arrearages also demonstrates that RUS intended to fund specific vendor work, not

just to make sufficient funds available for Open Range to unilaterally hire and pay

vendors to construct the broadband network.  As set forth above, RUS took

specific actions in response to vendor complaints about arrearages and threats to

stop work, including sending letters and e-mails in 2010 assuring that RUS would

fund specific arrearages owed to vendors and amending the Loan Agreement in

2011 to obligate RUS to make the advances in Schedules B-1 and B-2.

Because G4S presented sufficient evidence from which a reasonable trier of

fact could conclude that RUS intended for vendors, including G4S, to be paid from

loan funds for work performed on the Project, G4S raised a genuine issue of

material fact that should have precluded summary judgment.

## III.    The Trial Court Erred in Its Application of the Federal Circuit's Third Party Beneficiary Precedent.

The trial court erred in holding that it "was compelled to grant the

Government's motion for summary judgment" because G4S had "failed" to present

"clear evidence than an authorized government official approved a contract

provision for the express purpose of effectuating payment from the government to

the vendor." (A25-A26).  In addition to holding that there was no genuine issue of

material fact, the trial court erred in its interpretation and application of Federal

Circuit precedent regarding third party beneficiary status.

"For third party beneficiary status to be conferred on a party, the 'contract

must reflect the express or *implied* intention of the [contracting] parties to benefit

the third-party.'" *Sullivan v. United States*, 625 F.3d 1378, 1380 (Fed. Cir. 2010) (quoting *Montana v. United States,* 124 F.3d 1269, 1273 (Fed. Cir. 1997)) (emphasis added); *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1260 (Fed. Cir. 2005). "'[T]he intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby.'" *Flexfab*, 424 F.3d at 1260 (quoting *Montana,* 124 F.3d at 1273). Moreover, "[w]hen the intent to benefit the third party is not expressly stated in the contract, evidence thereof may be adduced." *Christos v. United States*, 300 F.3d 1381, 1384 (Fed. Cir. 2002) (citation omitted). "Such intent is determined by looking to the contract and, if necessary, ***other objective evidence.*** In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer and circumstances providing the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party." *Flexfab*, 424 F.3d at 1262-63 (emphasis added).

Although the trial court acknowledged the Federal Circuit standard, it went to extraordinary lengths to downplay the ability of a third party to demonstrate the government's intent through actions and circumstances. (A19) ("Notwithstanding this theoretical possibility, it is extremely difficult to establish status as an intended third-party beneficiary by inference in the context of a government contract.").

The trial court did acknowledge several cases addressing whether a subcontractor was an intended third party beneficiary of a government contract based on the actions of the contracting government official and attendant circumstances, but attempted to limit the court's ability to infer intent to the facts of those cases and articulated a new rule that does not comport with the Federal Circuit standard.

In *D & H Distrib. Co. v. United States*, 102 F.3d 542 (Fed. Cir. 1996), a prime contractor failed to pay the plaintiff-subcontractor for materials the subcontractor had furnished to the National Security Agency ("NSA") on the prime contractor's behalf. *Id.* at 544. Although initially reluctant to subcontract to the prime contractor, the subcontractor agreed after the NSA amended the prime contract to assign payment to the prime contractor and subcontractor jointly. *Id.* Notwithstanding this modification, after the subcontractor rendered performance, the NSA issued a check in the prime contractor's name only. *Id.* at 544-545. The prime contractor later became insolvent, having failed to fully compensate the subcontractor. *Id.* at 545. The Federal Circuit concluded that the subcontractor enjoyed the status of a third party beneficiary because the contracting parties' intent that the subcontractor "be paid" could be inferred from their actions, *i.e.*, negotiating and modifying the contract with a joint payment clause "designed to effectuate the payment of [the prime contractor]'s debt to [the subcontractor]." *Id.* at 547.

In the present case, the trial court construed the holding in *D & H* as limiting third party beneficiary status to cases where the subcontractor is made a joint-payee of the prime contract. (A20). To the contrary and highlighting the trial court's error, the Federal Circuit stated that *D & H* was a "particularly clear instance" of third party beneficiary status and did not require the court to "explore the outer bounds of third party beneficiary rights." *Id.* at 546-547.

In *JGB Enterprises, Inc. v. United States,* 63 Fed. Cl. 319 (2004), *aff'd,* 497 F.3d 1259 (Fed. Cir. 2007), the Federal Circuit again inferred intent to benefit a third party subcontractor through the actions of the contracting government agency and attendant circumstances. In *JGB Enterprises*, the Defense Logistics Agency, Defense Supply Center Columbus ("DSCC") awarded a contract to the prime contractor to supply various materials to the Defense Department. 63 Fed. Cl. at 323. The prime contractor then entered into a subcontract for one of the materials (hose assemblies), but failed to pay the subcontractor for the materials it provided. *Id.* The subcontractor then contacted the DSCC contracting officer to obtain assistance concerning the prime contractor's arrearages. *Id.* Following a series of communications between the subcontractor and DSCC officials, the subcontractor threatened to cease performance unless the situation was remedied. *Id.* at 323-324. Ultimately, the DSCC contracting officer agreed to amend the prime contract to provide that funds would be remitted to an escrow account specifically established

for the subcontractor and released to the subcontractor upon the consent of the prime contractor. 63 Fed. Cl. at 324-325; 497 F.3d at 1260. Notwithstanding this agreement, payment was rendered to the prime contractor, which subsequently became insolvent without having satisfied its debts to the subcontractor. 63 Fed. Cl. at 329. The Court of Federal Claims, as affirmed by the Federal Circuit, held that the subcontractor was a third party beneficiary of the prime contract because the purpose of the amendment was to ensure that the subcontractor "would be paid." 63 Fed. Cl. at 334; 497 F.3d at 1261 n.1 ("The government here concedes that both COs, Matthews and Moore, were *aware* that the change in the payment arrangements on the 2508 contract were intended to ensure payment to JGB." (emphasis added)).[16]

The court found persuasive the record evidence, i.e., correspondence, telephone conversations, and other communications, demonstrating that the contractor was "looking for ways to assure its subcontractor of payment so the subcontractor would ship the goods." *JGB Enterprises,* 63 Fed. Cl. at 333. The court specifically rejected the Government's argument that the contracting officers "did not consider it their responsibility to 'help' [the subcontractor]" and were not "interested in the general welfare of [the subcontractor]," holding that "[t]he only

---

[16] The Court of Federal Claims stated that, "[a]lthough [the vendor] was not listed by name as joint payee, [the contracting officer] understood that the Chase Manhattan Bank account was an account 'where monies will be directly sent or set aside for the vendor.'" 63 Fed. Cl. at 334

reasonable interpretation of the record mandates a finding that the Government intended to modify the contract to assure [the subcontractor] of payment so that [the subcontractor] would ship the hose assemblies that were 'urgently' needed." *Id.* at 334.

Accordingly, in *JGB Enterprises*, the Court of Federal Claims inferred that the government agency intended for the subcontractor be paid under the prime contract through evidence submitted by the subcontractor, which included correspondence and testimony regarding conversations. In affirming, the Federal Circuit declared: "A subcontractor is a third party beneficiary to the government contract when the CO knew or should have known that the government's payment on the contract was intended to directly benefit the subcontractor." 497 F.3d at 1261 n.1.

Focusing on only the joint payment provision in the *JGB Enterprises* case, the trial court erred below by setting forth a new standard for establishing third party beneficiary status: "[F]or a subcontractor to obtain the status of an intended third-party beneficiary, it must provide <u>clear</u> evidence that an authorized government official approved a contract provision for the <u>express</u> purpose of effectuating payment from the government to the subcontractor[s]." (A22) (emphasis in original). The trial court's new standard is contrary to the Federal Circuit's standard and not supported by the totality of the facts in *JGB Enterprises*.

To require approval of a particular "contract provision" for an "express purpose" (A22) articulates a much different and higher standard than that "the contract must reflect the express or *implied* intention of the [contracting] parties." *Sullivan*, 625 F.3d at 1380 (emphasis added). In justifying its new standard, the trial court explained that "the contracting officer in <u>JGB</u> took specific actions to modify the prime contract's payment mechanism for the ***express purpose*** of ensuring that JGB received payment from the government." (A24) (emphasis added). However, the "purpose" the trial court refers to was not "expressly" set forth in the contract language, but was inferred by the trial court from the record evidence, i.e., correspondence and testimony regarding conversations. As the court stated in *JGB Enterprises*, "[t]he only reasonable interpretation of the record mandates a finding that the Government intended to modify the contract to assure [the subcontractor] of payment so that [the subcontractor] would ship the hose assemblies that were 'urgently' needed." *JGB Enterprises*, 63 Fed. Cl. at 334.

Moreover, the trial court's interpretation of "express purpose of effectuating payment from the government to the subcontractor" as requiring a mechanism for joint or direct payment from the government to the subcontractor is also contrary to the Federal Circuit standard. (A24). In applying its new standard to the facts of this case, the trial court stated that "none of these agreements gave Open Range's vendors ***control*** over the pledged deposit account, required RUS to advance any

42

portion of the loan proceeds *directly* to any of Open Range's vendors, or required

RUS to advance a portion of the loan proceeds to an escrow-account *controlled* by

any of Open Range's vendors." (A24) (emphasis added).  However, the facts of

*JGB Enterprises* would not even pass muster under the trial court's new standard.

In *JGB Enterprises*, the government agency amended the prime contract to provide

that the government's funds were to be paid into an escrow account and only

released to the subcontractor after *both* the subcontractor and prime contractor had

signed off.  63 Fed. Cl. at 325.  Thus, although the prime contractor no longer had

total control over the funds, the fact that the funds were not paid directly to the

subcontractor and the prime contractor still needed to consent to release of the

funds, means that the litmus test cannot be subcontractor "control."

In order to fit the complicated facts of this case into a simplified legal

framework, the trial court created in error an artificial and unfounded requirement

of "express purpose of directly or jointly paying" the subcontractor.  (A24).

Accordingly, the trial court's holding that G4S and other beneficiaries were mere

"indirect beneficiaries" of the Loan Agreement boils down to the way in which

vendors were physically paid, rather than the intent behind the act of payment.  If

the standard for third party beneficiary status is direct or joint payment to the third

party, then the Federal Circuit's directive that "the requisite intent on the part of

the government can be inferred from the actions of the contracting officer and

circumstances providing the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party" is meaningless. *Flexfab*, 424 F.3d at 1262-63 (emphasis added).

In this case, the nature of the contract, i.e., a loan agreement, makes the way in which payment was physically effectuated different from *JGB Enterprises*, but that fact, alone, does not change the inference that RUS intended for G4S and other vendors to be paid. Like the DSCC in *JGB Enterprises*, RUS's intent that G4S and other vendors be paid can be inferred from: (1) RUS's knowledge, i.e., vendors were owed arrearages and were threatening to stop work if they were not paid; (2) RUS's interest, i.e., constructing a useful rural broadband network was of the highest importance; and (3) RUS's actions, i.e., sending letters and e-mails assuring funding for arrearages in 2010 and amending the Loan Agreement in 2011 to obligate RUS to make the advances in Schedules B-1 and B-2 in response to vendor complaints and threats to stop work. *Compare with JGB Enterprises*, 63 Fed. Cl. at 334 (rejecting the Government's argument that the contracting officers "did not consider it their responsibility to 'help' [the subcontractor]" and were not "interested in the general welfare of [the subcontractor]," on the ground that "[t]he only reasonable interpretation of the record mandates a finding that the Government intended to modify the contract to assure [the subcontractor] of

44

payment so that [the subcontractor] would ship the hose assemblies that were 'urgently' needed" ).

Moreover, even stronger than *JGB Enterprises*, which dealt only with the circumstances surrounding a single amendment to a supply contract, this case presents myriad facts from which the Court could (and should) infer that RUS intended for G4S to be paid under the Loan Agreement. Specifically, more compelling than *JGB Enterprises*, where the government agency's only involvement with the prime contractor and subcontractor was as a purchaser of supplies, in this case, RUS was a project partner highly involved in the selection, hiring, management, and payment of vendors. The unique relationship between and among RUS, Open Range, and G4S was demonstrated by the following facts established in the proceedings below: (1) the stated purpose of the Loan Agreement, which was to finance RUS-approved construction, could only be effectuated by using loan proceeds to pay vendors, including G4S; (2) Open Range's submission—and RUS's approval—of build-out plans every six months that unambiguously indicated that third party vendors, including G4S, would perform construction work; (3) RUS's review, editing, and approval of the MSA between Open Range and G4S; (4) RUS's review and approval of the individual contracts between Open Range and G4S that fell under the MSA, each of which set forth the scope of work that G4S would perform and the fees it would charge; (5)

RUS's direct communication with G4S when a contract had been approved and funds encumbered; (6) RUS's review of vendor invoices as part of the loan advance process; (7) RUS's requirement that Open Range establish a pledged deposit account from which funds could only be withdrawn as agreed to by RUS; (8) RUS's audits of the pledged deposit account to ensure that loan funds were disbursed according to RUS's intent and the terms of the contract; and (9) RUS's advance of funds on certain vendor contracts in response to vendor complaints. (A15-A16).

The trial court appeared to group improperly all of the aforementioned facts into the category of "general government oversight" of the prime contractor, which it held is insufficient to establish third party beneficiary status. As set forth, *supra*, there is a genuine issue as to whether these facts establish more than mere oversight and control of the Project. Moreover, the only case the trial court cited to support its refusal to give the aforementioned facts any weight was another decision of the Court of Federal Claims in *O. Ahlborg & Sons, Inc. v. United States*, 74 Fed. Cl. 178 (2006), which the Federal Circuit did not review on appeal and which is readily distinguishable from this case.

In *Ahlborg*, in order to secure a loan for the renovation and construction of a shipyard, the shipyard owner, MHI, entered into a Security Agreement with the government (i.e., the Maritime Administration or MARAD). The plaintiff

46

Ahlborg, which entered into a construction contract with MHI to build and renovate the shipyard, claimed it was a third party beneficiary of the Security Agreement when MHI defaulted on its obligation to pay Ahlborg. In stark contrast to G4S's situation, the court found that Ahlborg was not an intended third party beneficiary of the Security Agreement primarily because that Agreement stated that it "**is for the sole benefit of [MHI], the Secretary [i.e., MARAD]** and their respective successors and assigns, **and no other Person shall have any right hereunder**." 74 Fed. Cl. at 189 (emphasis added). Similarly, there was a "Consent of Contractor" which directly rebutted the third party beneficiary claims:

> "[The] Consent of Contractor made it clear that MARAD did not assume any obligation to [Ahlborg], stating: "The Secretary [*i.e.*, MARAD] shall, by virtue of the Security Agreement, have no obligation or duty under the Construction Contract [between Ahlborg and MHI], and shall not be required to make to [Ahlborg] or to any other entity any payment due and owing by [MHI] under the Construction Contract."

*Id*. at 189 (emphasis added) (some brackets added). The *Ahlborg* court noted that "[a] party cannot be an intended beneficiary when the parties have agreed to the contrary." *Id*. (citations omitted). Although RUS could have included a similar "Consent of Contractor" in its contract with Open Range, it did not do so.

Furthermore, in *Ahlborg*, the subcontractor did not offer any evidence, circumstantial or otherwise, that the payment provision "was to benefit Ahlborg." *Id*. at 190. In contrast, G4S has presented evidence through deposition testimony,

e-mails, letters, and other documentation that RUS intended for the Loan

Agreement to directly benefit vendors—that vendors, including G4S, be paid with

loan funds for work on the Project. Most compelling, the record establishes that

RUS took specific actions in response to vendor complaints about arrearages and

threats to stop work, including sending letters and e-mails in 2010 assuring RUS

funding for specific arrearages and amending the Loan Agreement in 2011 to

obligate RUS to make the advances in Schedules B-1 and B-2.

As an additional reason for refusing to confer third party beneficiary status

on the subcontractor, the *Ahlborg* court stated that the government agency's

"involvement in negotiating the contracts here and its oversight of the project are

insufficient to establish contractual privity" between the government and

subcontractor. 74 Fed. Cl. at 190. As support, the court cited *United States v.*

*Johnson Controls, Inc.*, 713 F.2d 1541, 1552 (Fed. Cir. 1983), in which the Federal

Circuit held that a subcontractor was not a "contractor" as the term is defined in the

Contract Disputes Act in part because there was no privity of contract between the

government and subcontractor arising from the doctrine of agency. Accordingly,

the doctrine at issue in *Johnson Controls, Inc.* is legally distinct from the third

party beneficiary doctrine, and thus *Johnson Controls, Inc.* is inapposite to both

*hlborg* and this case.[17]  The Federal Circuit has never held that the nature and

extent of government "involvement" and "oversight" of a subcontractor are

irrelevant to determining whether a subcontractor is a third party beneficiary of a

government contract.

The trial court in the present case ultimately based its holding on a parade of

horribles—that to find for G4S would create "a broad right of subcontractors to sue

the federal government in any case where the contracting officer closely oversees

the prime contractor's work with its subcontractors, or whenever an agency pays a

prime contractor with the knowledge that some of that payment would be used to

compensate subcontractors." (A25).  The trial court's fears are simply unfounded

(and provide an improper basis to grant judgment in the Government's favor), as

this case presents an extremely unique circumstance where RUS, which was

already intimately involved in the selection, hiring, management, and payment of

vendors, also took specific actions to ensure that vendors, including G4S, were

paid for arrearages.  Indeed, finding against G4S, would act as a signal to

government agencies that they may work arm-in-arm with private business

partners to hire vendors for work on government projects, but then hide behind the

guise of an "uninvolved creditor" if the project does not go according to plan.  The

---

[17] Similarly, *Cienega Gardens v. United States*, 194 F.3d 1231(Fed. Cir. 1998), did
not involve the third party beneficiary doctrine.

uncontroverted facts establish that RUS made assurances to G4S to induce it to provide, and continue providing, materials and services for a project RUS knew to be risky, and RUS should be held accountable for its actions.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons more fully stated herein, the Court of Federal Claims improperly entered summary judgment in favor of the Government. The court erred in holding that there was no genuine issue of material fact with respect to RUS's status as a third party beneficiary of the Loan Agreement. The court further erred in its interpretation and application of Federal Circuit precedent regarding third party beneficiary status.

This Court should find that G4S has stated a proper claim as a third party beneficiary of the Loan Agreement between RUS and Open Range, and neither *JGB Enterprises* nor *Ahlborg* precludes that claim. This Court should remand to the Court of Federal Claims with instructions to resume the proceedings to conduct additional discovery on the Government's alternative defenses.

Dated: July 14, 2014                    Respectfully submitted,

/s/ Lewis S. Wiener
Lewis S. Wiener, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street, N.W., Suite 700
Washington, D.C. 20001-3980
202.383.0140
202.637.3593 (fax)
lewis.wiener@sutherland.com

50

Of Counsel:
G. Brendan Ballard, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street, N.W., Suite 700
Washington, DC 20001-3980
202.383.0820
202.637.3593 (fax)
brendan.ballard@sutherland.com

CASE PARTICIPANTS ONLY

# ADDENDUM

# In the United States Court of Federal Claims

No. 12-8C
(Filed: February 11, 2014)

| | |
|---|---|
| G4S TECHNOLOGY LLC, | ) |
| | ) |
| Plaintiff, | ) Insolvent prime contractor; incidental or |
| | ) intended third-party beneficiary; |
| v. | ) subcontractor's right to obtain payment |
| | ) directly from the federal government; |
| THE UNITED STATES, | ) summary judgment |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

*Louis S. Weiner*, Washington, DC, for plaintiff.

*David A. Levitt*, U.S. Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, and *Jeanne E. Davidson*, Director, for defendant.

**O P I N I O N**

**FIRESTONE**, Judge.

In this case, G4S Technology LLC ("G4S" or "plaintiff")[1] alleges that it was an intended third-party beneficiary of a 2009 Loan and Security Agreement ("Loan Agreement") between the United States Department of Agriculture's Rural Utilities

---

[1] G4S was known as "Adesta LLC" prior to its name change, effective February 23, 2011. For ease of reference, the court refers to the plaintiff as "G4S" throughout the opinion.

Service ("RUS") and Open Range Communications, Inc. ("Open Range").[2]  Under the

Loan Agreement, RUS agreed to provide funds to Open Range that were to be used to

construct a wireless broadband network in hundreds of rural communities under the Rural

Development Broadband Loan and Loan Guarantee Program.  G4S, which was one of

Open Range's vendors, alleges that RUS breached its promise to pay G4S for

$10,321,340.11 worth of services that remained due to G4S after Open Range filed for

bankruptcy in 2011.

 Pending before the court is the defendant, the United States' ("the government")

motion to dismiss plaintiff's complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of

the United States Court of Federal Claims ("RCFC").  The government has moved, in the

alternative, for judgment on the pleadings under RCFC 12(c) or for summary judgment

under to RCFC 56.  The government contends that G4S cannot establish that it was a

third-party beneficiary to the Loan Agreement between Open Range and RUS.  Although

G4S has not cross-moved for summary judgment, plaintiff contends that it has alleged

sufficient facts—and that the undisputed evidence establishes—that G4S was an intended

third-party beneficiary of the Loan Agreement.

 For the reasons discussed below, the court finds that it has jurisdiction to consider

the plaintiff's claim, and that the government is entitled to summary judgment.

---

[2] Following limited discovery on whether plaintiff could demonstrate an implied-in-fact contract
with the government or G4S's status as a third-party beneficiary, plaintiff abandoned its implied-
in-fact contract theory.  <u>See</u> Pl.'s Suppl. Resp. at 1 n.1.

## I.   STATEMENT OF FACTS[3]

### a.  The 2009 Loan Agreement

On January 9, 2009, Open Range and RUS entered into a Loan Agreement by which RUS agreed to make a $267,298,000 loan to Open Range to finance construction of wireless broadband in 540 RUS-approved markets.  <u>See</u> Pl.'s Suppl. Resp. at 4.  The Loan Agreement established two conditions required for closure.  First, One Equity Partners III, L.P. ("OEP"), a private equity firm with an interest in Open Range, was required to deposit $97 million into Open Range's deposit account.  <u>See</u> Pl.'s Suppl. Resp. App. at A222.  This amount was to be used for operating expenses and construction of broadband networks outside of the RUS-approved markets ("Non-RUS Markets").  <u>See id.</u>; 2d. Am. Compl. Ex. A at 7; 7 C.F.R. § 1738.20 (2009) (listing eligibility requirements for loan applicants).  Second, Open Range was required to furnish to RUS a six-month plan that described the construction to be performed by tower site, estimated cost of construction, commencement and completion time frames, and the workforce that would be carrying out the construction.  <u>See</u> Pl.'s Suppl. Resp. App. at A199.  Open Range later submitted a six-month plan made clear that third-party vendors would be used to complete portions of the construction work.  <u>Id.</u> at A469.

### b.  Funding procedures under the Loan Agreement

The Loan Agreement required Open Range to establish a pledged deposit account into which RUS would deposit loan funds.  <u>Id.</u> at A202-03.  Funds in the pledged deposit

---

[3] Unless otherwise noted, the facts presented herein are not disputed and are derived from the complaint and the parties' briefs or the exhibits thereto.

A3

account were to be used solely for the purposes for which RUS advanced the funds. <u>Id.</u> at A203.  Further, disbursements from the account were required to be made in accordance with RUS Bulletin 1738-2 ("the Bulletin").[4] <u>Id.</u>  In addition, Article VII of the Loan Agreement established certain "Lender's Rights" related to RUS's obligation to fund loan advances.  Specifically, Section 7.1(b) stated that "RUS, in its sole discretion, may terminate the offer to make the Loan(s) and/or obligation to make Advances hereunder, under the circumstances specified in Schedule 1." <u>Id.</u> at A212.  The circumstances listed in Schedule 1 included, <u>inter alia</u>, Open Range's loss (or anticipated loss) of access to the spectrum necessary to operate the planned wireless broadband network. <u>Id.</u> at A224.

For advances to be used for engineering services (such as those provided by G4S), the Bulletin generally required that Open Range and the vendor forward a RUS Form 245 to RUS for approval. <u>Id.</u> at A238.  If approved, RUS was to send one copy of the approval to Open Range and one copy to the vendor. <u>Id.</u>  The Bulletin also established procedures for small-scale construction contracts.  When an outside contractor was used, the Bulletin required that either a RUS Contract Form 773 or other appropriate RUS contract be used.  Open Range, as the borrower, was required to finance small-scale construction projects (i.e., those of amounts not exceeding $500,000), and obtain

---

[4] RUS Bulletin 1738-2 is the Rural Broadband Access Loan and Loan Guarantee Advance and Construction Procedures Guide.  Among other things, the guide establishes "requirements and procedures to be followed by the borrowers in obtaining advances and making disbursements of Loan funds."  Pl.'s Suppl. Resp. App. at A231.

A4

reimbursement with loan funds once construction was completed.  Id. at A239.[5]  It is

undisputed that there was no provision in the Loan Agreement to provide direct payment

from RUS to the third-party vendors hired by Open Range.

### c.  Master Services Agreement

Open Range's relationships with the third-party vendors such as G4S, which it

hired to help carry out its obligations under the Loan Agreement, were each governed by

a Master Service Agreement ("MSA").  The MSA established a variety of requirements

on third-party vendors and Open Range, including the markets and committed dates,

technical specifications, general scope of work, and pricing.  See Compl. Ex. C at 13.

Plaintiff has provided evidence that Open Range submitted for RUS's review, comment,

and approval, a template of the MSA that it used for most of its vendors.[6]  See Pl.'s

Suppl. Resp. App. at A356-60 (e-mail message from Open Range seeking RUS feedback

on MSA and vendor selection process).

The MSA that G4S and Open Range executed contained provisions related to the

work ordering process.  Specifically, the MSA required that work being performed in

RUS-approved markets be conducted pursuant to an approved six-month plan and the

terms of RUS Forms 245 or 773.  See Compl. Ex. C. at 3.  For RUS-approved markets,

---

[5] Ultimately, RUS and Open Range did not consistently comply with the Loan Agreement's requirement that Open Range seek reimbursement after financing the small-scale construction projects.  As explained, infra, Open Range and vendors agreed that vendors would not be paid until 30 days after Open Range received loan advances from RUS.

[6] The government disputes that RUS "approved" the MSA used by G4S.  See Def.'s Suppl. Mem. at 3 ("discovery demonstrated that RUS did not know of its existence, and never had a copy, and hence could not have approved of payment arrangements between G4S and Open Range reflected in the MSA.").

invoicing and payment was to be in accordance with RUS regulations, however the MSA included a provision that Open Range "shall not be required to remit amounts to [vendors] until thirty (30) days following receipt of such funds by [Open Range] and from RUS."[7]  See Compl. Ex. C. at 5.

Invoicing and payment in Non-RUS Markets was to follow a different procedure than for RUS-approved markets.  Specifically, the MSA required that Open Range provide a purchase order to authorize work.  Id. at 5.  The MSA with G4S further required G4S to provide an invoice in accordance with the purchase order, with a payment due date of 45 days after Open Range's receipt of the invoice.  Notably, the MSA included a provision stating, "RUS is not liable for payment on any PO."[8]  Id. at 6; see Pl.'s Suppl. Resp. App. at A31.

### d.  Vendor concerns following suspension of RUS advances to Open Range

Open Range began to experience cash-flow difficulties following the June 2, 2010 suspension of RUS loan advances to Open Range.  The suspension was due to the Federal Communications Commission's ("FCC") decision to suspend the spectrum permit of Globalstar—the company through which Open Range had been licensing the spectrum rights necessary to operate its network.  As noted above, Open Range's loss of spectrum entitled RUS to cease making advances on the loan.  On July 14, 2010, RUS provided

---

[7] This provision in the MSA is apparently in conflict with RUS Bulletin 1738-2 because the Bulletin required borrowers to seek reimbursement from RUS after having first funded its subcontractors through operating funds.

[8] Plaintiff has provided evidence that the purpose of this provision was to ensure that RUS was not forced to advance loan funds for work that was outside the scope of RUS's rural broadband program.

Open Range with notice of its intent to terminate any remaining, unadvanced funds on

the loan if Open Range failed to obtain an alternate agreement to gain access to spectrum

rights.  See Def.'s Suppl. Mem. App. at A208.

By September 15, 2010 (if not earlier), Jonathan Adelstein, the Administrator of

the RUS, received an e-mail indicating that Open Range's vendors were seeking

immediate payment of past-due bills from Open Range.  See Pl.'s Suppl. Resp. App. at

A317.  On September 22, 2010, the FCC issued a temporary permit to Open Range that

allowed Open Range access to spectrum until January 31, 2011.  See Def.'s. Suppl. Mem.

App. at A206-07.  This permit, however, only covered 264 "Approved Communities."

Id.  As such, the maximum number of communities that Open Range could serve under

the Loan Agreement was reduced from the original 540 markets to 264 markets.  Id.

Having secured access to at least some spectrum, an Open Range Executive Vice

President contacted a Special Assistant to the Secretary of the United States Department

of Agriculture on September 23, 2010, to ask when Open Range's funding requests

would be fulfilled.  Pl.'s Suppl. Resp. App. at A396.  The record contains evidence that

Open Range informed RUS that Open Range's vendors were concerned about being paid

and that Open Range was worried that these vendors might leave the project.  Id.  The

Special Assistant responded by stating that Open Range could "expect the letter and

simultaneous release of funds by the end of the day."  Id. at A395.  With regard to the

vendors, the Special Assistant stated that "I think at this point our team feels the letter

will serve as the press release and we will continue to talk to anyone (vendors, press, etc)

A7

who we need to [in order to] help calm fears and rebuild credibility.  Jonathan [Adelstein] can talk to whomever you'd like in this regard."  Id.

In a letter dated that same day, RUS modified its July 14, 2010 letter.  Specifically, RUS withdrew its 90-day notice of intent to terminate the Loan Agreement, but left the suspension of funds in place with respect to certain communities that no longer had access to spectrum (i.e., those outside of the 264 "approved communities").  See Def.'s Suppl. Mem. App. at A206-08.  RUS authorized the immediate release of $14 million (for work done in June and July), and a future release of $5 million (for work done in July and August) upon receipt of a request from Open Range.  See id.; Pl.'s Suppl. Resp. App. at A392.  RUS stated that it would only consider advance requests for approved communities, and that no funds would be provided for conversion from Globalstar spectrum to any alternative.  See Def.'s Suppl. Mem. App. at A206-08.

On October 4, 2010, the Mr. Adelstein was copied on an email sent by Open Range to the Director of the RUS Broadband Division, Ken Kuchno, which stated that Open Range

> has a number of vendors requesting that [Open Range] give them assurances that RUS funding has been re-opened and it not [sic] currently curtailed.  They are most concerned due to the information in the press that indicates that advances were suspended on July 14 and there has been no public notice that this has been modified.  These vendors include [G4S] . . . . They have asked to see written confirmation that RUS is continuing to fund on a [sic] on-going basis.

Pl.'s Suppl. Resp. App. at A393.

On October 8, 2010, Mr. Adelstein sent a letter to Open Range approving a revised business plan that would provide support to the 264 communities covered by the

8

A8

FCC's temporary permit.  The letter stated that RUS "is modifying the funding

restrictions . . . to include any construction identified in the Build-Out Plan approved on

October 8, 2010, for the period of July 1, 2010, to December 31, 2010."  Pl.'s Suppl.

Resp. App. at A398.  On that same day, Mr. Kuchno also sent a letter to Open Range,

which stated that RUS was "approving the Build-Out Plan for the period of July 1, 2010

to December 31, 2010, that covers the deployment of 228 markets, of which 212 will be

funded with RUS funds and the remaining 16 with non RUS funds."  Pl.'s Suppl. Resp.

App. at A399.

> **e.  Subsequent requests for funds to pay continuing vendor arrearages**

Notwithstanding the October 8 letters, RUS continued to withhold funding

advances to Open Range through at least March 2011.  <u>See</u> Def.'s Suppl. Mem. App.

A94-99.  According to Mr. Kuchno, the decision to suspend advances was approved by

Mr. Adelstein.  <u>Id.</u>

On January 11, 2011, Open Range e-mailed Mr. Kuchno (and copied Mr.

Adelstein) seeking approval of two contracts: one held by another vendor, Alvarion, and

the other held by G4S.  Open Range requested that the G4S contract, which RUS had

allegedly rejected on December 2, 2010, be approved (i.e., funded) because (1) RUS had

provided verbal approval before the end of the year; (2) the funding for the specified

markets had already been approved under the July through December 2010 six-month

plan; and (3) the contracts had purportedly been "circulating through RUS for several

months."  <u>See</u> Pl.'s Suppl. Resp. App. at A321.  The next day, Mr. Adelstein wrote to Mr.

Kuchno about setting up a meeting to respond to Open Range.  <u>See</u> Pl.'s Suppl. Resp.

A9

App. at A319 ("Why wait until Wednesday? They seem to be concerned about getting

paid now.  I get there are issues, but can't we get to the bottom of it sooner?").

On March 11, 2011, Open Range sent a Weekly Status Report to RUS that

indicated, among other things, that Open Range's arrearages to its vendors represented a

risk to deploying the broadband network.  Included in the status report was a list of

monies owed to Open Range in order to pay vendor contracts.  With regard to G4S, the

report listed as follows:

> [G4S]: [$]2,600,000 [G4S] Contract C-9 - $200k needs to be drawn down
> from the current contract.  However, the contract needs to be amended to
> increase the value by approximately $250K to cover site acquisition pass
> through expenses.  However, there may be more required on this contract
> once site acquisition is completed for various sites on this contract.

Pl.'s Suppl. Resp. App. at A170.

### f.  April 29, 2011 Loan Amendment, Equity Commitment Letter, and Shareholder Agreement

On April 29, 2011, RUS and Open Range executed an amendment to the Loan

Agreement ("Loan Amendment") in which they agreed to reduce the loan amount from

$269,298,000 to $180,000,000 to reflect a network size of only 160 markets, rather than

the original 540 markets.  As a condition precedent to advancing additional funds, the

Loan Amendment required receipt of a letter from OEP to Open Range in which OEP

committed to provide up to an additional $40,000,000 of equity capital.  See Compl. Ex.

B at 9.

Also on April 29, 2011, Open Range Holding Company (the shareholder of Open

Range) and OEP executed an "Equity Commitment Letter."  This letter obligated OEP to

A10

provide up to $40,000,000 in additional capital to Open Range Holding, which would be used to fund Open Range's operating expenses. The Equity Commitment Letter was conditioned, however, on RUS's agreement to fund certain advances listed in attached Schedules B-1 and B-2. Schedule B-1 listed multiple contracts with outstanding amounts owed to G4S totaling $2,772,536. See Pl.'s Suppl. Resp. App. at A190.

Also on April 29, 2011, Open Range Holding and RUS entered into a "Shareholder Agreement." This agreement provided, among other things, that "[s]ubject to the terms and conditions of the Equity Commitment Letter . . . [OEP Holdings] shall from time to time purchase equity in the Borrower [Open Range] in an amount equal to $40,000,000 in the aggregate, at such times and in such amounts such that the Borrower would always have unrestricted cash and cash equivalents on its consolidated balance sheet sufficient to fund the following six weeks of operating expenses as reasonably determined by the Company." See 2d. Am. Compl. Ex. D.

After the Loan Amendment, Equity Commitment Letter, and Shareholder Agreement were executed, RUS funded the advances listed in Schedules B-1 and B-2. It is undisputed that G4S received the $2.7 million identified on Schedule B-1. However, an audit report prepared by a consultant to Open Range in September 2011 indicates that Open Range had not closed out its contracts with vendors, and that additional amounts were owed to G4S and other vendors at that time. See Pl.'s Suppl. Resp. App. at A332.

Open Range filed for bankruptcy on October 6, 2011. See In re Open Range Commc'ns, Inc., Bk. No. 11-13188, 2013 WL 542471, at *1 (Bankr. D. Del. Feb. 12, 2013). On that date, Open Range held, among other assets, a deposit account with a

A11

balance of $4.9 million.  Id.  The $4.9 million in funds were subsequently moved to an

escrow account.  Velocitel, Inc., another Open Range vendor, filed an adversary

proceeding against the appointed trustee and the United States seeking a declaration

regarding its rights to the escrow account.  The trustee filed an answer and a third party

complaint seeking a declaration that the escrow account was property of the estate.  As a

result, other parties, including G4S, were added as third-party defendants.  G4S, in turn,

filed an answer, counterclaims, and cross-claims against various parties, including RUS.

Although most of the parties reached a settlement resolving most of the disputes, the

settlement did not resolve the causes of action or claims that G4S had asserted against

RUS and the trustee, among others.  The Bankruptcy Court ultimately dismissed G4S's

cross-claims.  Id. at *5.[9]

    **g.  Procedural history**

       Plaintiff filed its initial complaint on January 3, 2012, and an amended complaint

on January 24, 2012.  The Government moved to dismiss on March 5, 2012.  Plaintiff

filed a second amended complaint, which was deemed filed on May 31, 2012.  The

government moved to dismiss the second amended complaint under RCFC 12(b)(1) and

RCFC 12(b)(6) on June 14, 2012.  On October 15, 2012, the court stayed consideration of

the government's motion, and ordered discovery on the limited issue of whether G4S

---

[9] Specifically, the Bankruptcy Court held that G4S had failed to allege facts that plausibly
supported a claim that the pledged deposit account was a "resulting trust" for the benefit of G4S.
See In re Open Range, slip. op. at 5.  Under Delaware law, a resulting trust "arises where a
person conveys property under circumstances that raise an inference that the person does not
intend the person taking or holding the property to have the beneficial interest in the property."
Id. (quoting Official Comm. Of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.,
432 B.R. 135, 148 (Bankr. D. Del. 2010)).

A12

could establish a contractual right to recovery against the United States.  On January 24,

2013, prior to the close of discovery, the government moved for judgment on the

pleadings, or, in the alternative, for summary judgment, a stay of discovery, and

expedited consideration of motion to stay discovery.  The court denied the government's

request for a stay of discovery on February 1, 2013.  The parties completed discovery on

or about July 2, 2013.  Supplemental briefing on the government's outstanding motions

was completed on September 6, 2013, and oral argument was heard on January 14, 2014.

## II.   DISCUSSION

As noted above, the government has moved to dismiss plaintiff's second amended

complaint under Rules 12(b)(1) and 12(b)(6) on the grounds that G4S cannot establish a

contractual relationship with the United States and thus this court cannot hear its case.

Plaintiff, as also noted above, argues that this court has jurisdiction because it is an

intended third-party beneficiary to the Loan Agreement.  As a general rule, the Tucker

Act does not provide the court with jurisdiction to hear a claim brought directly against

the federal government by a subcontractor.  See  28 U.S.C. § 1491(a) (2012); United

States v. Johnson Controls, Inc., 713 F.2d 1541, 1550 (Fed. Cir. 1983).  An exception

exists, however, which allows an intended third-party beneficiary of a government

contract to enforce its rights directly against the federal government.  See JGB Enters.,

Inc. v. United States, 497 F.3d 1259, 1261 (Fed. Cir. 2007).

It is well established that when the facts that convey subject-matter jurisdiction are

intertwined with those that determine the merits, the court may deny the 12(b)(1) motion

and elect to resolve the jurisdictional issues on either a motion for summary judgment or,

A13

after a hearing, on the merits.  See Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 203

n.19 (1974); Land v. Dollar, 330 U.S. 731, 739 (1947); Moden v. United States, 404 F.3d

1335, 1340-42 (Fed. Cir. 2005); Spruill v. Merit Sys. Prot. Bd., 978 F.2d 679, 689 (Fed.

Cir. 1992) (nonfrivolous claim within jurisdiction sufficient to withstand motion to

dismiss).  Moreover, when the court considers—and does not exclude—materials outside

of the pleadings, dismissal under RCFC 12(b)(6) or 12(c) is not appropriate.  See Briseno

v. United States, 83 Fed. Cl. 630, 634 (2008).  Rather, such a motion must be converted

into one for summary judgment under RCFC 56(c).  Id.

Here, G4S's contention that it was an intended third-party beneficiary of the Loan

Agreement between RUS and Open Range goes to the heart of both the court's

jurisdiction under the Tucker Act and the merits of plaintiff's claim, rendering resolution

of the dispute under RCFC 12(b)(1) inappropriate.  The court finds that G4S has made a

nonfrivolous claim regarding its potential status as a third-party beneficiary.  Therefore,

the government's motion to dismiss for lack of subject-matter jurisdiction is **DENIED**.

The court will thus proceed to consider the matter on summary judgment.[10]

    **a.  Standard of review for Rule 56 motions for summary judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

RCFC 56(a).  The court's task is to determine whether there exists a genuine issue of

material fact for trial, and not "to weigh the evidence and determine the truth of the

---

[10] Because the court has considered, and not excluded, materials that were not part of the
pleadings, the court also **DENIES** the government's RCFC 12(b)(6) and 12(c) motions.

A14

matter . . . ."  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 249 (1986).  As it does for all

Rule 56 motions, the court views the evidence in a light most favorable to the nonmoving

party, drawing reasonable inferences in its favor.  <u>See</u> <u>Schooner Harbor Ventures, Inc. v.</u>

<u>United States</u>, 569 F.3d 1359, 1362 (Fed. Cir. 2009); <u>Galvin v. Eli Lilly & Co.</u>, 488 F.3d

1026, 1031 (D.C. Cir. 2007).  If the court finds that a rational trier of fact could not find

for the nonmoving party, then there is no genuine issue for trial and the movant is entitled

to summary judgment.  <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (quoting

<u>Matsushita Elec. Industr. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).  Whether

G4S was an intended third-party beneficiary under the Loan Agreement between RUS

and Open Range is appropriate for resolution on summary judgment.  <u>See</u> <u>Flexfab, L.L.C.</u>

<u>v. United States</u>, 424 F.3d 1254, 1259, 1265 (Fed. Cir. 2005) (affirming summary

judgment where plaintiff did not present evidence sufficient to raise a genuine question as

to status as intended third-party beneficiary).

   **b.  Positions of the parties**

   Plaintiff contends that the Loan Agreement between RUS and Open Range

demonstrated their intent to directly benefit Open Range's vendors by compensating

them for work performed in constructing the broadband network.  Plaintiff argues that

intent can be inferred from the following facts: (1) the stated purpose of the Loan

Agreement, which was to finance RUS-approved construction, could only be effectuated

by using loan proceeds to pay vendors; (2) Open Range's submission—and RUS's

approval—of build-out plans every six months that unambiguously indicated that third-

party vendors would perform construction work; (3) RUS's review, editing, and approval

A15

of the MSA between Open Range and G4S; (4) RUS's review of vendor invoices as part

of the loan advance process; (5) RUS's requirement that Open Range establish a pledged

deposit account from which funds could only be withdrawn as agreed to by RUS; (6)

RUS's and Open Range's communication about the vendors' progress and concerns in

constructing the broadband network, including that some vendors had threatened to stop

work if they were not paid; (7) Schedules B-1 and B-2 of the Equity Commitment Letter,

which obligated RUS to advance specific funds to pay for specific vendor work

performed under specific vendor contracts; and (8) RUS's audits of the deposit account to

ensure that loan funds were disbursed according to RUS's intent and the terms of the

contract.

      In response, the government argues that these facts are not sufficient to show that

RUS intended to confer a benefit directly on G4S, such that G4S is entitled to sue the

United States for payment.  According to the government, the only "intended

beneficiaries" of the Loan Agreement were the residents of the rural communities within

RUS-approved markets.  Because RUS never committed to pay—and never in fact

paid—any of Open Range's vendors directly, the government views G4S as only an

"incidental beneficiary" of the Loan Agreement.  The government asserts that G4S's

status as an incidental beneficiary is unaffected by RUS's review of vendor progress

reports and payment requests or its knowledge that Open Range would use the loan

advances in order to pay its vendors.

A16

### c.   The legal standard for third-party beneficiary status

Traditionally, a third party could not sue on a contract to which it was not a party.

See 13 Williston on Contracts § 37:1 (4th ed. 2013).  Over time, however, courts began to

recognize a limited exception in instances "when a promisor agrees with a promisee to

render a performance to a third party instead of to the promisee . . . ."  Id.; see also

Restatement (Second) of Contracts § 302 (1981).[11]  Nevertheless, it remains the general

rule that a subcontractor that agrees to supply materials or labor to a general contractor is

only an incidental beneficiary of any contract between the general contractor and its

ultimate client.  See 9 Corbin on Contracts § 45.3 (rev. ed. 2007); Restatement (Second)

of Contracts § 302 cmt. e., illus. 19; accord BIS Computer Solutions, Inc. v. City of

Richmond, 122 F. App'x 608, 610, 612 (4th Cir. 2005) (finding subcontractor was not an

intended third-party beneficiary under Virginia law despite being named in prime

contract and contract provision prohibiting subcontractor's removal without the

government's approval).  Thus, this narrow exception applies only when the contracting

---

[11] Section 302 provides as follows:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302.

A17

parties demonstrate their intent to confer a direct benefit on a third party. <u>See</u>

Restatement (Second) of Contracts §§ 302, 304. For example:

> B promises A to pay whatever debts A may incur in a certain undertaking.
> A incurs in the undertaking debts to C, D and E. If the promise is
> interpreted as a promise that B will pay C, D and E, they are intended
> beneficiaries . . . [but] if the money is to be paid to A in order that he may
> be provided with money to pay C, D and E, they are at most incidental
> beneficiaries.

<u>Id.</u> § 302, cmt. b, illus. 3.[12]

   In applying these general principles, the court's task is to distinguish between

prime contracts that create "intended beneficiaries," which establish a duty in the

government to the third-party vendor, and contracts that merely create "incidental

beneficiaries," which do not establish any such obligation. <u>See</u> Restatement (Second) of

Contracts § 304. In conducting this analysis, the court looks first to the language of the

prime contract, and then to other objective evidence. <u>See</u> <u>Flexfab</u>, 424 F.3d at 1262.

Although the express naming of a third party "greatly facilitates a determination that the

promisor and promisee intended to confer enforceable rights on the named party," 9

Corbin on Contracts § 44.8, the prime contract's express identification of a subcontractor

is neither necessary nor sufficient to demonstrate the requisite intent, <u>see</u> <u>Flexfab</u>, 424

F.3d at 1260; 9 Corbin on Contracts § 44.8; Restatement (Second) of Contracts § 308

---

[12] Comment e, Illustration 19, similarly states, "A contracts to erect a building for C. B then
contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's
promise, and B is an incidental beneficiary of C's promise to pay A for the building."
Restatement (Second) of Contracts § 302 cmt. e., illus. 19.

cmt. a; see also Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1997)

(plaintiff must "fall within a class clearly intended to be benefited thereby").

      Where a subcontractor seeks recognition as an intended beneficiary of a federal

contract, it is possible to infer the requisite intent on the part of the government "from the

actions of the contracting officer and circumstances providing the contracting officer with

appropriate notice that the contract provision at issue was intended to benefit the third

party." Flexfab, 424 F.3d at 1262.  Notwithstanding this theoretical possibility, it is

extremely difficult to establish status as an intended third-party beneficiary by inference

in the context of a government contract. See, e.g., id. at 1263-65 (declining to infer

contracting officer's knowledge or intent based on actions of other contracting

personnel); US Ecology, Inc. v. United States, 245 F.3d 1352, 1356 (Fed. Cir. 2001)

(holding government's cooperation with third-party insufficient to establish third-party

beneficiary status); O. Ahlborg & Sons, Inc. v. United States, 74 Fed. Cl. 178, 189-90

(2006) (holding government's involvement in negotiating subcontracts and program

oversight insufficient to establish contractual privity with subcontractor); JGB Enters.,

Inc. v. United States, 63 Fed. Cl. 319, 334 (2004) (declining to infer contracting officer's

knowledge or intent based on actions of other contracting personnel).  Indeed, because

waivers of sovereign immunity are construed narrowly, the right to sue the government

on a contract to which one is not a party constitutes an "exceptional privilege." Glass v.

United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (quoting German Alliance Ins. Co. v.

Home Water Supply Co., 226 U.S. 220, 230 (1912)).  The standards to be applied in this

circuit for determining whether a subcontractor can claim status as an intended third-

A19

party beneficiary are laid out in the following cases: <u>D & H Distrib. Co. v. United States</u>, 102 F.3d 542 (Fed. Cir. 1996) ; <u>Flexfab</u>, 424 F.3d 1254; and <u>JGB</u>, 63 Fed. Cl. 319, <u>aff'd</u>, 497 F.3d 1259 (Fed. Cir. 2007).

In <u>D & H</u>, a prime contractor ("CIM") failed to pay the plaintiff ("D & H"), its subcontractor, for materials plaintiff had furnished to the National Security Agency ("NSA") on CIM's behalf.  <u>See D & H</u>, 102 F.3d at 544.  Although initially reluctant to subcontract to CIM, D & H agreed after the NSA amended the prime contract to assign payment to CIM and D & H jointly.  Notwithstanding this modification, after D & H rendered performance the NSA issued a check in CIM's name only.  CIM later became insolvent, having failed to fully compensate D & H.  The Federal Circuit concluded that D & H enjoyed the status of a third-party beneficiary.  The circuit explained:

> The entire purpose of the <u>joint payment clause</u> was to provide protection for D & H by giving it a right to control the disbursement of the contract proceeds and thereby to ensure that its invoice to CIM would be paid.  The rights conferred on D & H were designed to effectuate the payment of CIM's debt to D & H, which would arise upon CIM's execution of the contract.

<u>D & H</u>, 102 F.3d at 547 (emphasis added).  Thus, the court adopted a rule that a subcontractor is entitled to enforce a contract where the subcontractor is made a joint-payee of the prime contract.  <u>Id.</u>

In <u>Flexfab</u>, the Federal Circuit again addressed the right of a subcontractor to sue the federal government directly after a prime contractor failed to pay the subcontractor. In that case, the Defense Logistics Agency, Defense Supply Center Columbus ("DSCC") awarded a contract to Capital City to supply various materials to the Defense Department.

20

A20

Flexfab, 424 F.3d at 1257.  Despite initial reluctance, Flexfab eventually agreed to

subcontract to Capital City after various DSCC officials promised to amend the prime

contract to provide for direct payment to Flexfab's escrow account.  Id.  Notwithstanding

this agreement, payment was rendered to Capital City, which subsequently became

insolvent without having satisfied its debts Flexfab.  Id. at 1258.  Flexfab brought suit

against the federal government alleging, inter alia, that Flexfab was an intended third-

party beneficiary of the contract amendment.

The Federal Circuit concluded that Flexfab had failed to show that the relevant

DSCC contracting officer intended to convey a benefit on Flexfab, and thus denied

recovery.  Id. at 1262-63 ("Though . . . the modification of a remittance clause to give a

subcontractor control over payments from the government qualifies the subcontractor as

an intended third-party beneficiary, that rule of law is subject to the principle that only

those with authority to contract on the government's behalf can exhibit the necessary

intent to give the subcontractor such control.").  The court thus made clear that the

government's ratification of a contract provision that expressly provides for direct

payment to a subcontractor remains unenforceable by the subcontractor, absent evidence

of such intent of an authorized government official.  See id.

JGB involved non-payment by the same prime contractor in Flexfab, but a

different subcontractor ("JGB").  JGB, 63 Fed. Cl. 319 (2004).  Unlike the plaintiff in

Flexfab, however, JGB directly contacted the DSCC contracting officer in order to obtain

assistance concerning Capital City's arrearages.  Id. at 323.  Following a series of

communications between JGB and DSCC officials, JGB threatened to cease performance

A21

unless the situation was addressed.  The DSCC contracting officer subsequently

threatened Capital City with debarment if the situation was not resolved.  Id. at 324.

Ultimately, the DSCC contracting officer agreed to amend the prime contract to allow for

direct payment to an escrow account designated by the prime contractor, which in

actuality was JGB's bank.  See JGB, 497 F.3d at 1260.  Notwithstanding this agreement,

the government mailed payment to Capital City.  JGB, 63 Fed. Cl. at 329.  Moreover, the

payment reflected a deduction due to monies owed by Capital City on an unrelated

contract with the government.  Id.  Capital City became insolvent without having

satisfied its debt to JGB.  Despite the fact that JGB was not listed by name as a joint-

payee, the court concluded that because the DSCC contracting officer understood that the

purpose of amending the payment procedure was to set aside monies for JGB, JGB

became an intended third-party beneficiary of Capital City's contract with the

government.  Id. at 334.

> **d.  Tested by the aforementioned standards, plaintiff cannot show that G4S
>     was an intended third-party beneficiary**

The court gleans from these cases that in order for a subcontractor to obtain the

status of an intended third-party beneficiary, it must provide clear evidence that an

authorized government official approved a contract provision for the express purpose of

effectuating payment from the government to the subcontractor(s).  This showing can be

satisfied by the unambiguous language of the prime contract and any modifications made

thereto, and by other objective evidence that clearly demonstrates the authorized

official's unambiguous intent to ensure payment to the subcontractor(s).  The court will

not, however, infer that the government intended to directly benefit the subcontractor

merely because an authorized government official (1) oversees the activities of the prime

contractor; (2) becomes aware that the prime contractor has failed to timely pay its

subcontractors, and/or (3) makes funds available to the prime contractor in order for the

prime contractor to pay its subcontractors.  Applied to this case, plaintiff has failed to

identify any evidence—much less clear evidence—that Mr. Kuchno or Mr. Adelstein

approved a contract provision for the express purpose of ensuring that a portion of the

loan advances would go directly to Open Range's vendors, including G4S.[13]

To begin, nothing in the plain language of the Loan Agreement indicates that RUS

intended to assume any obligation to ensure that Open Range's vendors received, directly

or jointly with Open Range, any payment from RUS.  Rather, the Loan Agreement

explains how, and for what purpose, RUS would disburse funds to Open Range's deposit

account.  Similarly, plaintiff has not identified any provision of the Loan Amendment,

Equity Commitment Letter (including Schedule B-1), or Shareholder Agreement in

which RUS unambiguously agreed to modify the loan advance process for the express

purpose of effectuating payment directly to Open Range's vendors.  Notably, none of

these agreements gave Open Range's vendors control over the pledged deposit account,

---

[13] The court notes that the RUS Administrator was authorized to approve loans in excess of $25,000,000, and RUS "Area Directors" were authorized to approve smaller loans and modifications in the methods of carrying out loan purposes.  See 7 C.F.R §§ 1700.55(a)-(c) (2010).  Plaintiff has not identified—and the court is unaware of—any RUS officials other than Mr. Adelstein and Mr. Kuchno whose intent to benefit Open Range's vendors would be relevant to resolving the government's Motion for Summary Judgment.  See Flexfab, 424 F.3d at 1262 ("only those with authority to contract on the government's behalf can exhibit the necessary intent" to benefit a third party to establish third-party beneficiary rights).

required RUS to advance any portion of the loan proceeds directly to any of Open

Range's vendors, or required RUS to advance a portion of the loan proceeds to an

escrow-account controlled by any of Open Range's vendors.  At most, these agreements

provided RUS with additional notice of Open Range's outstanding obligations to its

vendors.

Even granting plaintiff the inference that authorized RUS officials were concerned

that Open Range's vendors might stop working if arrearages weren't addressed, the

record is devoid of evidence that an authorized RUS official intended to do anything but

pay Open Range so that Open Range had sufficient funds to carry out its plan of

constructing a rural broadband network.  RUS's close oversight of Open Range,

awareness of Open Range's arrearages, and willingness to advance loan funds to Open

Range, taken individually or in combination, are insufficient to demonstrate that RUS

approved the Loan Amendment for the express purpose of directly or jointly paying Open

Range's vendors.  In this connection, plaintiff's contention that G4S is similarly situated

to the plaintiff in <u>JGB</u> rings hollow.  Unlike Mr. Adelstein and Mr. Kuchno, the

contracting officer in <u>JGB</u> took specific actions to modify the prime contract's payment

mechanism for the express purpose of ensuring that JGB received payment from the

government.[14]  <u>See JGB</u>, 497 F.3d at 1260-61.  Thus, in contrast to JGB, G4S fits

squarely within the category of indirect beneficiaries identified in Restatement (Second)

---

[14] Although the other case plaintiff relies on, <u>FloorPro, Inc. v. United States</u>, 98 Fed. Cl. 144, 145-46 (2011) can be similarly distinguished, that decision was subsequently vacated by the Federal Circuit, 680 F.3d 1377 (Fed. Cir. 2012).

of Contracts § 302, cmt. b., illus. 3 (if money is paid to the prime contractor in order to

ensure the prime contractor has money to pay subcontractors, the subcontractors are at

most incidental beneficiaries).  As such, plaintiff has failed to establish that G4S was an

intended third-party beneficiary of the agreements between RUS and Open Range.[15]

For the court to hold otherwise would transform the "exceptional privilege" of

status as an intended third-party beneficiary into a broad right of subcontractors to sue the

federal government in any case where the contracting officer closely oversees the prime

contractor's work with its subcontractors, or whenever an agency pays a prime contractor

with the knowledge that some of that payment would be used to compensate

subcontractors.  Such an expansion of an otherwise narrow exception to the requirement

that a plaintiff be in privity with the government would undermine the traditional

relationship between contracting officers and prime contractors, as well as between prime

contractors and their subcontractors.  Therefore, without clear evidence that an authorized

---

[15] The court notes that plaintiff previously indicated that it intended to request additional
discovery pursuant to RCFC 56(d)(2).  See Pl.'s Opp. to Def.'s Mot. for Stay of Disc. at 6, ECF
No. 37 ("G4S plans to request further discovery pursuant to RCFC 56(d)(2) on issues such as the
RUS's involvement in negotiating the language of the form Master Services Agreement,
including a deposition of Scott Steiner.").  Plaintiff has not filed an affidavit or declaration
explaining with precision how additional discovery would aid its response to the government's
motion for summary judgment.  Because such an affidavit or declaration is required for a party to
avail itself of the shelter provided by RCFC 56(d), the court **DENIES** plaintiff's request to
postpone ruling on the government's summary judgment motion to allow for additional
discovery.  See Carolina Power & Light Co. v. United States, 48 Fed. Cl. 35, 41 (2000) (citing
cases).  Moreover, because the court has already assumed the facts that G4S asserts (i.e., that
RUS helped draft the MSA, supervised construction, and knew that payments to Open Range
would be used to reimburse vendors), additional discovery to confirm those facts is unwarranted.
Id.  The government's close oversight of the prime contractor—including oversight of the
prime's relationships with its subcontractors—is simply insufficient confer status as an intended
third-party beneficiary on a subcontractor.

A25

government official approved a contract provision for the express purpose of effectuating payment from the government to the vendor, subcontractors remain merely incidental beneficiaries.  Because G4S has failed to make this showing, the court is compelled to **GRANT** the government's motion for summary judgment.[16]

### III.    CONCLUSION

Based on the foregoing discussion, the court concludes that G4S has failed to establish a genuine dispute as to whether G4S was a third-party beneficiary of the Loan Agreement between RUS and Open Range.  Therefore, the Government's Motion for Summary Judgment is **GRANTED**.  The clerk is directed to enter judgment accordingly. Each party to bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[16] Because the court concludes that plaintiff has not raised a genuine dispute as to G4S's status as a third-party beneficiary, the court does not reach the government's alternative defenses.

26

A26

# In the United States Court of Federal Claims

### No. 12-8 C

**G4S TECHNOLOGY LLC**

**JUDGMENT**

**v.**

**THE UNITED STATES**

Pursuant to the court's Opinion, filed February 11, 2014, granting defendant's motion for summary judgment,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant.  Each party to bear its own costs.

Hazel C. Keahey
Clerk of Court

**February 11, 2014**               By:     s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $505.00.

# United States Court of Appeals
## for the Federal Circuit

*G4S Technology, LLC v United States,* No. 2014-5078

### CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by SUTHERLAND ASBILL & BRENNAN, LLP, Attorneys for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On **July 14, 2014,** counsel has authorized me to electronically file the foregoing **Appellant's Principal Brief** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

> David A. Levit
> U.S. Department of Justice
> Commercial Litigation Branch, Civil Division
> 1100 L Street, N.W., Room 11138
> Washington, DC 20815
> 202-307-0309
> c-natcourts.appeals@usdoj.gov
> david.levitt@usdoj.gov

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

July 14, 2014                              /s/ Robyn Cocho
                                           Counsel Press

# CERTIFICATE OF COMPLIANCE

I, Lewis S. Wiener, attorney for Plaintiff-Appellant in the above-captioned appeal hereby certify:

1.      This brief complies with the applicable type-volume limitations of Federal Circuit Rule 32(b) and Federal Rule of Appellate Procedure 32(a)(7)(B). Exclusive of the portions exempted by Federal Circuit Rule 32(b) and Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 12,853 words.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements for Federal Rule of Appellate Procedure 32(a)(6) because this brief was prepared in a proportionately spaced typeface using Microsoft Word, Version '2010, in 14 Point Times New Roman.

/s/ Lewis S. Wiener
Lewis S. Wiener
*Counsel for Plaintiff-Appellant*